RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 21a0190p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

VICTOR DEWAYNE TAYLOR,

        *Petitioner-Appellant*,

    *v.*

SCOTT JORDAN, Warden,

        *Respondent-Appellee*.

No. 14-6508

On Petition for Rehearing En Banc

United States District Court for the Eastern District of Kentucky at Lexington.
No. 5:06-cv-00181—Danny C. Reeves, District Judge.

Argued En Banc:  March 3, 2021

Decided and Filed:  August 23, 2021

Before:  SUTTON, Chief Judge; BATCHELDER, MOORE, COLE, CLAY, GIBBONS, COOK,
GRIFFIN, KETHLEDGE, WHITE, STRANCH, DONALD, BUSH, LARSEN,
NALBANDIAN, READLER, and MURPHY, Circuit Judges.[*]

─────────────────

## COUNSEL

**ARGUED EN BANC:**  Dennis J. Burke, DEPARTMENT OF PUBLIC ADVOCACY, La
Grange, Kentucky, for Appellant.  S. Chad Meredith, OFFICE OF THE ATTORNEY
GENERAL OF KENTUCKY, Frankfort, Kentucky, for Appellee.  **ON SUPPLEMENTAL
BRIEF:**  Dennis J. Burke, DEPARTMENT OF PUBLIC ADVOCACY, La Grange, Kentucky,
Thomas M. Ransdell, Frankfort, Kentucky, for Appellant.  S. Chad Meredith, OFFICE OF THE
ATTORNEY GENERAL OF KENTUCKY, Frankfort, Kentucky, for Appellee.

─────────────────

[*]Pursuant to 6 Cir. I.O.P. 35(c), Composition of the En Banc Court, Judge Batchelder and Judge Cook,
senior judges of the court who sat on the original panel in this case, participated in this decision.  Judge Thapar
recused himself from participation in this decision.

KETHLEDGE, J., delivered the opinion of the court in which SUTTON, C.J., and BATCHELDER, COOK, BUSH, LARSEN, NALBANDIAN, READLER, and MURPHY, JJ., joined.  MOORE, J. (pp. 23–27), in which CLAY, WHITE, STRANCH, and DONALD, JJ., joined, COLE, J. (pp. 28–37), in which MOORE, CLAY, WHITE, STRANCH, and DONALD, JJ., joined in all but Section I.A.i., GRIFFIN, J. (pp. 38–52), in which GIBBONS, J., joined in full and MOORE, CLAY, WHITE, STRANCH, and DONALD, JJ., joined in all but footnote 1, and WHITE, J. (pp. 53–57), in which MOORE, CLAY, STRANCH and DONALD, JJ., joined in full and GIBBONS, J., joined in Parts I and II, delivered separate dissenting opinions.

———————————

**OPINION**

———————————

KETHLEDGE, Circuit Judge.  Victor Taylor murdered two high-school students in 1984, for which a jury convicted him of capital murder and recommended a sentence of death.  The trial judge imposed that sentence and the Kentucky Supreme Court repeatedly denied Taylor's claims for relief.  Taylor eventually filed a federal habeas petition, arguing (among many other things) that the prosecutor at his trial had discriminated against African-American members of his venire.  The district court denied Taylor's petition.  We affirm.

I.

A.

On Saturday, September 29, 1984, Scott Nelson and Richard Stephenson, two 17-year-old students at Trinity High School in Louisville, drove together to a football game at a rival school, Louisville Manual High School.  Both students were white.  Around 8:30 p.m., they got lost and stopped outside the "Moby Dick" restaurant in Louisville to ask for directions.  There they encountered Victor Taylor and his cousin, George Wade, who were then ages 24 and 23, respectively.  Taylor and Wade are African-American.  After a brief exchange among the four of them, Taylor pulled a gun from his waistband and forced his way into the car's back seat, along with Wade.  Taylor told the boys to drive down an alley to an abandoned lot, where he told the boys to get out of the car.  Taylor and Wade took the boys' wallets, which they stripped of cash and then returned.  But then Taylor and Wade removed the boys' pants, tied their hands behind

their backs, and gagged them. While the boys lay helpless, Taylor anally raped Nelson. Sometime during this sequence of events, Wade happened to address Taylor by name.

Eventually Taylor and Wade walked away from the scene, taking the boys' money, pants, jackets, shoes, a gym bag, cassettes, a feather clip, and a portable radio—but leaving the boys alive, though bound and gagged. Soon Taylor told Wade he was worried the boys could identify them, particularly since Wade had used Taylor's name. After a moment, Taylor said "he [*i.e.*, Taylor] was going to have to take them [*i.e.*, the boys] out." Taylor then returned to the crime scene. There, one of the boys "tried begging, talking them out of hurting them, that they'd done enough to them already." But Taylor shot them both. Police discovered the boys' bodies the next day, each of them shot in the head execution-style with a Winchester-Western hollow-point round from a .357 Magnum.

Around 9:30 p.m. that night, Taylor and Wade returned to the home of Taylor's mother. There, several members of Taylor's extended family were present, playing cards. One of them was Eugene Taylor, who said that Taylor and Wade came into the house "smiling" and carrying a gym bag, cassettes, gray tennis shoes, and blue jeans, among other items. Taylor asked his sister, Renee Taylor, whether she had heard about the "white boys" getting killed. Taylor also told Renee—but within earshot of the whole group—"[t]hat he had killed two white boys."

A homicide investigation soon led to Wade, who said that he had participated in the kidnaping but that Taylor had shot the boys. Police then searched the homes of Taylor's mother, Anna Taylor, and sister, Renee. In the home of Taylor's mother, police found the victims' gym bag and a radio. On Taylor's bed, police also found cassettes (by Def Leppard, Led Zeppelin, and Van Halen), initialed "SCN" and belonging to Scott Nelson; under Taylor's bed, police found Nelson's shoes. In Anna Taylor's room, in plain view—though she denied seeing them—police found gray Puma sneakers belonging to Richard Stephenson. Taylor's mother likewise denied seeing Nelson's feather clip, which police found attached to a lamp-wire in plain view in her kitchen. During the search of Renee Taylor's home (in which Taylor also had a bedroom), police found several .357 hollow-point bullets manufactured by Winchester-Western—even though neither Renee nor her husband owned a gun. During that

search, police also saw that Renee's husband, Charles Woods, was actually wearing Scott Nelson's blue jeans; Woods told the officer the jeans were "Victor's[.]"

Around that same time, an officer on patrol in the neighborhood saw that Taylor's girlfriend, Shermayne Van Dyke, was wearing Nelson's black jacket. She said that Taylor had told her that he "stole it" from a local shopping mall. Another young woman in the neighborhood, Beverly Shackleford, told police that, the morning after the murders, Taylor had offered to sell her a "green school jacket." She also said that, on three separate occasions in the days after the murders, she had heard Taylor boast about killing the two boys. On the morning of October 4, 1984, the police arrested Taylor.

B.

1.

A grand jury in Jefferson County (where Louisville is located) thereafter indicted Taylor and Wade for kidnapping, robbery, sodomy, and capital murder. Due to extensive coverage of the murders in the local media, the trial court transferred the defendants' cases to Fayette County in Lexington. The State chose to try the defendants separately. Wade's trial came first; he received a life sentence.

Jury selection for Taylor's trial began with a venire of 118 people. The trial judge in Taylor's case was African-American; so was the prosecutor. During voir dire, each potential juror (or "venireperson") was questioned individually; counsel for each side could then move to strike the venireperson for cause, or the court might excuse the person on hardship or other grounds. The prosecutor's questions for each potential juror were the same regardless of the person's race. Over the course of voir dire, the defense moved to strike three black venirepersons for cause; the prosecutor opposed every one of those strikes, and the court kept those persons on the venire.

Voir dire ended with 38 persons remaining on the venire, of whom six were African-American. At that point the defense argued that the case should be transferred again to a different venue, given that most of the venirepersons had seen coverage of the Wade trial and

that only "32% of the panel" remained.  The prosecutor responded that those remaining 38 jurors "are in effect a cross section of the community."  In support of that assertion, the prosecutor volunteered to submit into the record a chart that he had recently prepared, listing the name, race, marital status, education level, employment status, and occupation of each of the 38 persons remaining on the venire.  The court entered the chart into the record and denied the motion to change venue.

The parties then proceeded to exercise their peremptory strikes, which each side submitted to the court clerk simultaneously.  The prosecution was allotted nine strikes, of which it exercised only eight.  Four of the eight venirepersons struck by the prosecutor were white, and four black.  The defense exercised all 14 of its allotted strikes, one of which was used to strike a black member of the venire.  That left 16 potential jurors, one of whom the court later excused for cause.  The final panel included 12 jurors and three alternates.  Of the 12 jurors, one was African-American—namely Eleanor Fisher, whom the defense had earlier sought to strike for cause.

Five days later, the defense objected again to the jury, arguing that it was "not representative of a cross-section of the community," that "the jury that we have now contains only one minority member," and that the prosecution had used "half of their strikes to exclude two-thirds of minority members left on the panel."  That prompted the following exchange between counsel:

> Jasmin [prosecutor]:  You say I used two-thirds of my strikes to strike minorities?
>
> Jewell [defense counsel]:  Half of your strikes to exclude two-thirds of minority members on the panel.
>
> Jasmin:  Half, meaning four and a half?
>
> Jewell:  You used four—You used eight, I believe, correct?
>
> Jasmin:  That's correct.
>
> Jewell:  Okay.  And, four of them were directed at minority members.
>
> Jasmin:  And, for the record, the Commonwealth would note defense also struck at least one or two black folk.
>
> Jewell:  The defense struck one minority member.

The prosecutor and court then had the following exchange about the relevant caselaw, including *Batson v. Kentucky*, 476 U.S. 79 (1986), which was then pending at the Supreme Court:

> Jasmin: In accordance with case law, the Commonwealth has no other rational reason—if I strike all it then becomes objectionable under the cases from, as I understand it, coming from California.
>
> The Court: The California case is not the law of the land. I'm not sure what the name of the Supreme Court case that's presently up on certiorari.
>
> Jasmin: Right.
>
> The Court: I believe the issue being addressed at this time as to whether it is permissible to exercise your peremptory strikes whichever way you wish to. I don't know, but the record's clear as to what has been done in this case.

The court denied the defense's motion, and the parties proceeded to trial. The evidence of Taylor's guilt included that two patrons of the restaurant had seen Taylor pull a "revolver" on the two boys and force his way into the car, along with Wade; that Taylor had boasted about the murders to at least three other people; and that the victims' belongings and bullets like the ones used to kill them had been found at Taylor's home. The prosecution also played an audio tape of Wade's statement, which identified Taylor as the murderer. The jury convicted Taylor on all counts and unanimously recommended a death sentence.

A few days later, the Supreme Court issued its decision in *Batson*, in which it held that the prosecution violates a black defendant's right to Equal Protection if the prosecution engages in "[p]urposeful racial discrimination in selection of the venire[.]" 476 U.S. at 86. Three weeks after that, the trial court entered its judgment in Taylor's case, in which the judge imposed the death penalty and found that "the Defendant was afforded a fair trial, with his constitutional safeguards fully protected."

2.

Taylor appealed that judgment directly to the Kentucky Supreme Court. *See* Ky. Rev. Stat. § 532.075. In his brief on appeal, Taylor raised 44 different claims, including that the prosecutor had violated *Batson* when he struck four of the six black members of the venire. That claim ran less than a page; Taylor argued only that "the prosecutor directed 4 of his peremptory

strikes toward black members of the jury panel and never offered any explanation for the exercise of those peremptory challenges." Most of Taylor's 145-page brief instead focused on his claim that the admission of Wade's confession had violated the Confrontation Clause.

The Kentucky Supreme Court affirmed the trial court's judgment. *See Taylor v. Commonwealth* (*Taylor I*), 821 S.W.2d 72, 77 (Ky. 1990). The court stated that it had "carefully reviewed all of the issues presented by Taylor[,]" but that its opinion would "concentrate on the question of the admissibility of the Wade confession and the propriety of the trial judge's refusal to grant a second change of venue." *Id*. at 74. The remaining claims—including the *Batson* one—the court summarily rejected as "without merit[.]" *Id*.

Seven years later, Taylor filed a post-conviction motion under Kentucky Rule 11.42. That rule barred a defendant from presenting claims already adjudicated on direct review. *See Thacker v. Commonwealth*, 476 S.W.2d 838, 839 (Ky. 1972). Taylor's motion included 45 claims of error, including a claim under *Swain v. Alabama*, 380 U.S. 202 (1965), the relevant pre-*Batson* case on racial discrimination in jury selection. (Whereas *Batson* allowed a defendant to obtain relief based on discrimination in jury selection at his own trial, *Swain* required a defendant to show that the prosecutor had a "systematic practice" of excluding blacks from juries in all criminal cases. *Id.* at 223.)

The court held an evidentiary hearing on Taylor's post-conviction motion, at which Taylor presented evidence that the prosecutor's office that brought his case had systematically discriminated against black venirepersons. The court later denied Taylor's motion.

Taylor appealed again to the Kentucky Supreme Court, which denied relief. *See Taylor v. Commonwealth* (*Taylor II*), 63 S.W.3d 151 (Ky. 2001). The court held that Taylor's *Swain* claim was merely a relabeled *Batson* one, which "was decided against Taylor on direct appeal and, therefore, cannot be raised in his [Rule] 11.42 motion." *Id*. at 157. In dicta, the court added that Taylor had "presented no evidence that" the discriminatory practices cited at the evidentiary hearing had "continued unabated at his trial." *Id*. (internal quotation marks omitted). The court gratuitously added the following:

> *Batson* also requires—to establish a prima facie case—a showing of "other relevant circumstances" that create an inference that the prosecutor struck the jurors on the basis of their race. In the case at bar, there was no showing of other relevant circumstances at the time defense counsel objected to the seating of the jury and no such argument on this point was made on direct appeal. Moreover, the trial court specifically noted that there was no evidence that African-Americans were systematically excluded from the venire. Therefore, since a prima facie case was not made under *Batson*, it certainly was not made under the much more restrictive holding of *Swain*.

*Id.* (internal citations omitted).

### 3.

Taylor later sought habeas relief in federal district court, presenting more than 50 claims. The district court denied relief in a thoroughly reasoned opinion. *See Taylor v. Simpson*, No. 5:06-181-DCR, 2014 WL 4928925 (E.D. Ky. Sept. 30, 2014). A panel of this court affirmed, over one judge's dissent on the *Batson* issue. *See Taylor v. Simpson*, 972 F.3d 776 (6th Cir. 2020). We granted rehearing en banc.

### II.

### A.

We review the district court's decision de novo. *See Davis v. Carpenter*, 798 F.3d 468, 472 (6th Cir. 2015). More to the point, however, is the standard under which we review the Kentucky Supreme Court's decision denying relief on Taylor's *Batson* claim. That decision came in *Taylor I* and was undisputedly on the merits. That means Taylor must show that the decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

### 1.

Taylor argues that the Kentucky Supreme Court's rejection of his *Batson* claim in *Taylor I* was "contrary to" *Batson* itself, which if true would mean we review that decision de novo. *See Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). As relevant here, a state court's decision is "contrary to" Supreme Court precedent, for purposes of federal habeas review, "if the

state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases." *Id*. at 405.  That standard by its terms is inapposite here, since the Kentucky Supreme Court's rejection of Taylor's *Batson* claim came in the form of a "summary denial"—meaning the court did not recite its reasoning (or the applicable "rule") in support of the decision.  *See Cullen v. Pinholster*, 563 U.S. 170, 187 (2011).  That is not a criticism of the state court's decision:  summary denials are common enough, particularly in cases like this one, where the petitioner presented the state court with literally dozens of claims for relief.  Normally we review summary denials under the "unreasonable application" prong of § 2554(d)(1), asking specifically whether any "fairminded jurist[]" could have agreed with any "arguments or theories" that "could have supported the state court's decision."  *Id*. at 188.  That standard is as deferential as it sounds.  *See id.*

Yet Taylor argues that the Kentucky Supreme Court's rejection of his *Batson* claim in *Taylor I* was "contrary to" *Batson*—in light of what that court said about his *Swain* claim, eleven years later, in *Taylor II*.  That argument is as convoluted as it sounds.  As explained above, in *Taylor II* the court rejected Taylor's *Swain* claim on the procedural ground that the claim was, in substance, the same *Batson* claim that the court had rejected years before.  What Taylor points to now, however, is the court's dicta in *Taylor II*, in which Taylor says the court misconstrued *Batson*.

The relevant rule from *Batson* concerns the showing necessary to establish "a prima facie case" for an Equal Protection claim.  As the *Batson* Court described that showing in one of its multiple formulations of this point, "the defendant first must show that he is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race."  476 U.S. at 96 (citation omitted).  Taylor made those showings here.  More to the point, the defendant must also "show that these facts and any other relevant circumstances raise an inference that the prosecutor used [peremptory strikes] to exclude the veniremen from the petit jury on account of their race."  *Id*.  Taylor says that the court in *Taylor II* misconstrued the latter requirement.  Specifically, he contends, the court's insistence upon "a showing of 'other relevant circumstances' that create an inference that the prosecutor struck the jurors on the basis of their race[,]" 63 S.W.3d at 157, implied that the court

thought that a defendant can never establish a prima facie case based on numbers alone. One could read the opinion in *Taylor II* to have that implication; and we have no quarrel with Taylor's point that the implication would misconstrue *Batson*. The relevant question, more succinctly stated, is simply whether "the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Batson*, 476 U.S. at 94. And if, for example, a prosecutor had a dozen peremptory strikes and used every one of them to strike black members of the venire, the numbers alone could be enough to make out a prima facie *Batson* claim.

Where Taylor goes wrong, however, is in his assertion that we should impute that mistake to the court's rejection of his *Batson* claim 11 years before. To that end Taylor relies on *Wilson v. Sellers*, 138 S. Ct. 1188 (2018). There, the Court held that—when a state court's summary denial of a federal claim is preceded by a decision (say, by an intermediate appellate court) that *did* explain its reasoning for denying the claim—then a federal court on habeas review "should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale." *Id*. at 1192. Taylor argues we should "look through" the summary denial of *Taylor I* to the mistaken dictum in *Taylor II*—and thus conclude that *Taylor I* was "contrary to" *Batson*.

*Wilson* does include the words "look through," but otherwise provides zero support for Taylor's argument here. What *Wilson* established (or perhaps reiterated) was a presumption: that, "'[w]here there has been one reasoned state judgment rejecting a federal claim, *later unexplained orders* upholding that judgment or rejecting the same claim rest upon the same ground.'" *Id*. at 1194 (emphasis added) (quoting *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991)). The Court explained that this presumption was "realistic" because "state higher courts often (but certainly not always) write 'denied' or 'affirmed' or 'dismissed' when they have examined the lower court's reasoning and found nothing significant with which they disagree." *Id. Wilson* thus addressed cases where a higher state court (typically the state supreme court) summarily affirms a lower court's *earlier* reasoned denial of a federal claim—in which case one can typically presume that "the state supreme court adopted the same reasoning." *Id*. at 1196.

Hence Taylor is looking the wrong way as he makes his argument here. The decision under review is *Taylor I*, in which the court obviously did not "examine" the reasoning of *Taylor II* eleven years later. *Id*. at 1194. One therefore cannot presume—much less "realistic[ally,]" *id*.—that *Taylor I* "adopted" the reasoning of *Taylor II*. Both the rule and the rationale of *Wilson* are thus wholly inapposite here. Nor does Taylor cite a single case in which a habeas court imputed the mistake of a later state-court decision to an earlier one.

Taylor says that we should do that anyway, because the author of *Taylor I* joined the opinion in *Taylor II*. But that kind of judicial forensics is simply no basis on which to set aside "the State's interest in the finality of convictions that have survived direct review within the state court system." *Calderon v. Thompson*, 523 U.S. 538, 555 (1998). To the contrary, in *Wilson*, six justices (over the dissent of three others) described the extent to which a habeas court can ascribe the rationale of one state court decision to another. We have no basis in law or common sense to draw that line any differently.

The fact is that, in this case, as "in *Richter*, there was no lower court opinion to look to." *Wilson*, 138 S. Ct. at 1195 (discussing *Harrington v. Richter*, 562 U.S. 86, 96-100 (2011)). And that means the rule of *Richter*—which is the same rule cited above from *Cullen*—applies here. *See Cullen*, 563 U.S. at 188 (stating that, absent a state court opinion on the merits, the habeas court "must determine what arguments or theories could have supported the state court's decision" (cleaned up)). Taylor's look-through argument is "contrary to" *Wilson* itself.

2.

a.

We therefore proceed under the "unreasonable application" prong of § 2254(d)(1), and ask whether any fairminded jurist could have adopted any argument or theory that supported the Kentucky Supreme Court's rejection of Taylor's *Batson* claim in *Taylor I*. *See Richter*, 562 U.S. at 102. It takes more to apply that standard than to perform a direct-review analysis and then simply announce that fairminded jurists could not disagree. "What it takes, rather, is a willingness to take seriously the arguments that supported or 'could have supported' the state-court decision; and then to ask not merely whether we agree with those arguments, but

whether they are coherent and grounded enough in the facts and applicable law that an unbiased jurist could agree with them." *Etherton v. Rivard*, 800 F.3d 737, 757 (6th Cir. 2015) (dissenting opinion) (quoting *Richter*, 562 U.S. at 102), *rev'd sub nom. Woods v. Etherton*, 136 S. Ct. 1149 (2016) (per curiam).

In answering that question, the Supreme Court has said more than once, our review under § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen*, 563 U.S. at 181; *see also, e.g.*, *Holland v. Jackson*, 542 U.S. 649, 652 (2004) (per curiam) ("whether a state court's decision was unreasonable must be assessed in light of the record the court had before it"). (On this point, contrary to the suggestion of Taylor's counsel during oral argument before the en banc court, the Court's approach in *Miller-El v. Dretke*, 545 U.S. 231 (2005), was a one-off; there, the State itself relied upon evidence not before the state court at the time of its decision. *See id*. at 256 n.15.) That means we may not consider the evidence proffered by Taylor at his post-conviction Rule 11.42 hearing.

The question before us, again, is whether any fairminded jurist could conclude, in *Taylor I*, that Taylor had not shown "that the totality of the relevant facts gives rise to an inference of discriminatory purpose" as to the prosecutor's use of peremptory strikes against four of the six African-American members of the venire. *Batson*, 476 U.S. at 94. Taylor's argument in support of this claim in his brief in *Taylor I*—in full—was the following:

> Being black, appellant is a member of a cognizable racial group. The prosecutor directed 4 of his peremptory strikes toward black members of the jury panel and never offered any explanation for the exercise of those peremptory challenges.

Apart from the fact of Taylor's own race, therefore, the only fact that Taylor cited in support of his *Batson* claim in *Taylor I* was that the prosecutor had struck four of the six African-American members of the venire—a 67% exclusion rate. *Batson* claims based solely on exclusion rates "typically include[] patterns in which members of the racial group are completely or almost completely excluded from participating on the jury." *Carmichael v. Chappius*, 848 F.3d 536, 547 (2d Cir. 2017). In *Carmichael*, like here, the petitioner had relied solely on the fact that the prosecution had "removed six" of the eight black members of the venire "with peremptory challenges"—a 75% exclusion rate. *Id.* Reviewing that claim under § 2254(d)(1),

and applying the same standard that we apply here, Judge Cabranes wrote on behalf of a unanimous panel: "Whether the 75 percent exclusion rate at issue here" established a prima facie *Batson* claim "is a matter on which fairminded jurists could disagree." *Id*. at 548 (cleaned up). We see no reason to reach a different conclusion here (and would create a circuit split if we did).

Moreover, an immovable obstacle to Taylor's *Batson* claim—especially on habeas review—is that the prosecutor in his case affirmatively *objected* to the defense's attempt to strike for cause three African-American members of the venire. All those objections were successful; and, as a result, one of those black venirepersons, Eleanor Fisher, sat on the jury at trial. A fairminded jurist could conclude—we think would likely conclude—that a prosecutor who aimed to purge the jury of African-Americans would not object to the *defense's* attempt to remove three of them from the venire. Nor, such a jurist might conclude, would a prosecutor with that aim leave one of his peremptory strikes unused while two African-Americans remained on the venire—which again is what the prosecutor did here. A decision to grant the writ in this case would simply ignore the habeas standard that the Supreme Court has told us again and again that we must apply.

b.

Taylor points to three aspects of the record in arguing for a contrary result here. The first is that, on the chart that the prosecutor volunteered to submit into the record, the prosecutor had noted the race of each of the 38 qualified venirepersons—which Taylor says supports an inference of racial discrimination. But that same chart also noted the education, employment status, occupation, and marital status of each qualified member of the venire. (The gender of each venireperson was obvious enough without a separate notation.) And all those characteristics were relevant to the Sixth Amendment's requirement that the venire reflect "a fair cross section of the community." *Taylor v. Louisiana*, 419 U.S. 522, 527 (1975). That requirement means that potential jurors cannot be excluded from the venire based on race, *Smith v. Texas*, 311 U.S. 128, 130 (1941); or sex, *Taylor*, 419 U.S. at 530; or occupation, *Thiel v. S. Pac. Co.*, 328 U.S. 217, 222 (1946); or based on being part of any "identifiable segments playing major roles in the community[.]" *Taylor*, 419 U.S. at 530. The characteristics on the

prosecutor's chart—including race—therefore bore directly on whether the venire's members reflected a fair cross-section of the community. Indeed that is precisely why the prosecutor offered to put the chart into the record, when the defense implied that the venire did not reflect such a cross-section. A jurist could therefore fairly conclude that the chart reflected the prosecutor's intent to comply with the Constitution, rather than violate it.

Taylor's second point is that—during the prosecutor's exchange with defense counsel regarding peremptory strikes—the prosecutor said "the Commonwealth has no other rational reason" for something or other—the prosecutor did not finish his thought. But that fragment does not compel any particular conclusion any more than the average Rorschach test does. Again, here is the prosecutor's remark in full:

> In accordance with case law, the Commonwealth has no other rational reason—if I strike all it then becomes objectionable under the cases from, as I understand it, coming from California.

What we can tell from this remark is that the prosecutor was talking about the "case law[,]" since what followed was "[i]n accordance with" it. His reference to "if I strike all" is perhaps a reference to the then-applicable *Swain* rule, which basically required a defendant to show that the prosecutor in his case had sought to strike every black venireperson in virtually every case. *See* 380 U.S. at 223. But the reality is that what the prosecutor sought to convey here is anyone's guess. What is clear enough, however—and what matters for our purposes—is that a fairminded jurist would hardly be compelled to think that this remark amounted to a confession in open court that the prosecutor had invidiously discriminated against black members of the venire.

Finally, Taylor likewise reads an admission of racial discrimination into the trial judge's comment about the clarity of the record in his case. That comment came after the judge mentioned the *Batson* case then pending at the United States Supreme Court. Again, here is the judge's comment in full:

> I believe the issue being addressed at this time as to whether it is permissible to exercise your peremptory strikes whichever way you wish to. I don't know, but the record's clear as to what has been done in this case.

The latter sentence by its terms was a comment about the adequacy of the record in Taylor's case—not about any particular conclusion to draw from that record. And this same judge—who had obviously followed *Batson* at the Supreme Court—specifically found in his judgment, 27 days after *Batson* was decided, that "the Defendant was afforded a fair trial, with his constitutional safeguards fully protected." On habeas review at least, Taylor's *Batson* claim is without merit.

B.

1.

Taylor also argues that the admission of Wade's statement at trial violated Taylor's rights under the Confrontation Clause. At the time of Taylor's trial and of the Kentucky Supreme Court's decision in *Taylor I*, the admissibility of Wade's statement was governed by *Ohio v. Roberts*, 448 U.S. 56 (1980), *overruled by Crawford v. Washington*, 541 U.S. 36 (2004). Under *Roberts*, the Confrontation Clause allows the admission into evidence of an unavailable declarant's statement that "bears adequate indicia of reliability." *Id*. at 66 (internal quotation marks omitted).

The Kentucky Supreme Court held that test was met as to Wade's statement because "[e]very material detail" of that statement "was corroborated by independent testimony and physical evidence." *Taylor I*, 821 S.W.2d at 75. That analysis was similar to the one adopted by a plurality of the U.S. Supreme Court in *Dutton v. Evans,* 400 U.S. 74, 88-89 (1970). *See Idaho v. Wright*, 497 U.S. 805, 823 (1990) ("a plurality of the Court in *Dutton v. Evans* looked to corroborating evidence as one of four factors in determining whether a particular hearsay statement possessed sufficient indicia of reliability"). Just two months before the Kentucky court decided *Taylor I*, however, the U.S. Supreme Court rejected that approach, holding that the circumstances relevant to the reliability determination "include only those that surround the making of the statement and that render the declarant particularly worthy of belief." *Wright*, 497 U.S. at 819. Four justices dissented, arguing that "[i]t is a matter of common sense for most people that one of the best ways to determine whether what someone says is trustworthy is to see if it is corroborated by other evidence." *Id*. at 828 (Kennedy, J., dissenting). Thus, the U.S.

Supreme Court eventually reached a different conclusion than the Kentucky Supreme Court did in *Taylor I* as to the value of corroborating evidence in determining whether a hearsay statement was admissible under *Roberts*.

We therefore consider whether—in light of all the other evidence of Taylor's guilt—the admission of Wade's statement at trial was harmless. In deciding that question, we disregard what the Kentucky Supreme Court had to say about it—again, in dicta—in *Taylor v. Commonwealth (Taylor III)*, 175 S.W.3d 68 (Ky. 2005). *See supra* at 11-12. Instead, we ask whether the admission of Wade's statement had a "'substantial and injurious effect or influence in determining the jury's verdict.'" *Davis v. Ayala*, 576 U.S. 257, 268 (2015) (quoting *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995)). If "the record is so evenly balanced that a conscientious judge is in grave doubt" as to whether that standard is met, the habeas court may grant relief. *O'Neal*, 513 U.S. at 437. But even the "grave doubt" standard "requires much more than a 'reasonable possibility' that the result of the hearing would have been different." *Ayala*, 576 U.S. at 276 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

Here, Taylor suggests that the erroneous admission of a co-defendant's confession is categorically "devastating" to a defendant's case. Both the Supreme Court and ours, however, have found the erroneous admission of a co-defendant's confession to be harmless. *See, e.g., Schneble v. Florida*, 405 U.S. 427, 432 (1972); *Stewart v. Trierweiler*, 867 F.3d 633, 637-38 (6th Cir. 2017). And more devastating to Taylor's case, when one actually sits down and reads the trial transcript as a whole, were Taylor's own confessions—on no less than five different occasions, as testified to by three witnesses at trial—that Taylor shot Nelson and Stephenson.

Start with the testimony of Beverly Shackleford, a neighborhood acquaintance who—unlike almost every other witness in the case—had neither any criminal charges pending against her nor any familial relationship with Taylor. Shackleford testified that, two days after the murders, while Shackleford was walking on Clay Street, Taylor and a companion walked toward them the opposite way. As the three of them came close to each other, Shackleford heard the other young man ask Taylor: "man, did you really kill them two dudes." Taylor responded: "yeah, I did it; and there ain't a goddamn thing they can do about it. It's a game."

Not long after, Shackleford and a friend ("Nesee") were standing "[a]t the corner of Hancock and Finzer, in front of Thoroughbred Liquors." Taylor was also standing there, with "about ten or twelve other people standing around." She said that "Victor was bragging again. One of the guys asked Victor if he really killed those two white dudes." Again Taylor answered: "Yeah, I did it. Ain't a damned thing they can do about it."

Not long after that incident, Shackleford walked down Jackson Street, before turning east onto Breckinridge. At the corner, she saw Taylor standing with two young men. As Shackleford "got to the corner where you cross from the alley over, th[e]y were—they took off walking. I couldn't have been five steps behind them." One of the men asked Taylor if he killed the two boys; "[o]nce again, he admitted; yes, he did it." The "other guy" then "told Victor that he needed to stop talking about all the dumb shit." On cross-examination, Taylor's counsel pressed Shackleford about when she had told the police about these incidents and about the dates of the incidents themselves. But on redirect Shackleford repeated what she had said in her direct testimony: "I don't remember the specific dates. I roughly estimated them." And as to whether she had "any doubt" that she had "heard [Taylor] make these statements[,]" Shackleford was adamant: "There is no doubt. I heard it and I saw it." She added, in response to a question: "I've known him as Victor for many a year."

The second witness who heard this kind of boasting was Taylor's cousin, Eugene Taylor, who saw Taylor and Wade enter the home of Taylor's mother around 9:30 p.m. on the night of the murders. (That timing comports with the testimony of one of the witnesses of the boys' abduction outside the Moby Dick, who said the time was between 8:30 and 9 p.m.; the other witness likewise said it was "sort of dark" then.) Taylor promptly asked his sister, Renee, whether she had heard about the two "white boys" getting killed. (The boys' bodies were not found until the next day.) Soon thereafter—again in the home of Taylor's mother, and within earshot of everyone present—Taylor told Renee that he had killed the two boys.

The third witness to hear Taylor's confession was Jeffrey Brown, a self-described "jail house lawyer" who had known Taylor since about 1979. In November 1984, both men were confined in the Jefferson County Jail. Not long after Taylor arrived there, Brown was in the "day room" on the "sixth floor" of the jail, where inmates were "sitting around playing dominoes

and what have you, different table-top games." Brown testified that Taylor approached him ("Taylor came to me") and began asking Brown questions about Taylor's case, at which point the other men "kind of filtered back off." Taylor told Brown that he and George Wade had been out looking to "get some money in their pocket." Taylor said "[t]hese guys in the car pulled up to the curb and stopped him and George"—in Taylor's account, the boys were looking for marijuana. Taylor said that he and Wade "got in the car with the guys" and that Taylor "pulled the pistol on them." As they drove, Taylor "began to look for an area that was not a lot of people around, secluded area." They "found this area where there was nobody at," and Taylor "made the guys pull over and get out of their car." Then Taylor said he was "holding the gun on them while George went through their—searching them and stuff for money." They found some, but not a lot. Then Taylor and Wade made the boys take off "their shoes and socks" and "certain parts of their clothes"—including the boys' pants—"looking for money." Taylor and Wade put those items in "some type of bag." Around this time, Wade referred to Taylor by name. After the boys were undressed, Taylor recounted, Wade "started talking real bad. He said, boy, you look like a little whore and a little female." Taylor said this was "when the freak shit started coming up in their minds." At that point, Taylor related, "both of them, he and George," proceeded "to have sexual intercourse in the guys [sic] rectum or ass[.]"

When the "sex thing" was done, Taylor said, he "told George that by calling him his name that they'll have to make sure these guys don't get a chance to identify them or whatever. They could inform the police about what happened, because he'd already given him his name." Then Taylor "told George he was going to have to take them out"—meaning "to kill them." Taylor "followed through with that"—he said "we killed them, shot them." Taylor also "said"— in a detail likely more inflammatory than any that Wade provided in his statement—that "one of the guys—he didn't, you know, say which one, said they tried begging, talking them out of hurting them, that they'd done enough to them already." But Taylor said he killed them anyway.

Taylor now argues that Brown and Eugene Taylor alike received favorable plea deals in connection with their testimony, which appears true enough. The same is true of legions of witnesses whom juries find credible in criminal trials. Taylor also emphasizes that Brown briefly recanted his account of what Taylor had told him—as Brown himself readily admitted at trial.

But Brown said that recantation came after Taylor had repeatedly—"more than three or four" times—threatened "physical harm to me or my mother." One of those threats came on January 15, 1985, "in the front holding pen of the Jefferson County Jail. They were bringing Victor Taylor by, two guards were bringing him by, shackled. We had words"—which included a physical threat.

What Taylor does not dispute, however, is that Brown had no apparent means to make this story up. And contrary to Taylor's argument that Wade's statement was the only evidence at trial that described the whole criminal sequence in detail, Brown's testimony did exactly that. (The testimony of Cecil Pepper and Dino Pace did the same for the circumstances of the boys' abduction.) Indeed, the fact that Brown's account so closely matched Wade's—of which Brown was presumably unaware—strongly corroborates Brown's testimony. Moreover, Brown was the only witness to describe the boys begging for their lives and the rape of Nelson. No other witness at trial testified to that rape; and that an anal swab of Nelson yielded sperm further corroborates Brown's account. (So too does the discovery at the crime scene of a "beige shirt" with pubic hairs on it; Pace testified that one of the men who abducted the boys—whom he later identified as Taylor—was wearing a "Brown/tan shirt.")

The circumstantial evidence in Taylor's case was likewise compelling. In the days after the murders, officers found Taylor's girlfriend wearing Stephenson's jacket and Taylor's brother-in-law wearing Nelson's jeans. Their explanations for having those items only tied the items more closely to Taylor: his girlfriend said that Taylor had told her that he "stole" the jacket from a nearby shopping mall; and Taylor's brother-in-law told the officer (who confirmed the point in his own testimony) that the jeans were "Victor's." Moreover, as recited above, during the search of the home of Taylor's mother (Anna Taylor), police found Nelson's cassette tapes on Taylor's bed and Nelson's shoes underneath it; and they found Stephenson's gray Pumas in plain view in Anna Taylor's bedroom and a feather clip belonging to one of the victims attached to a lamp wire in the kitchen. Anna Taylor denied seeing the shoes or clip, even though they had been in plain view for days.

Meanwhile, in the search of the home of Taylor's sister (Renee Taylor), police found three .357 caliber hollow-point bullets that had been manufactured by "Winchester-Western"—just like the bullets used to kill Nelson and Stephenson. Nobody who lived in the home (other than Taylor) even owned a gun. (The dissent points out that those bullets came from a different "lot" than the ones used in the murders. But the expert who testified about the bullets said it was "very common" for even a single firearm to be loaded with bullets from different lots.) Renee Taylor claimed at trial that she had found the bullets in the attic when she moved into the home, and for some reason had kept them in her dresser drawer ever since. That testimony was about as credible as the testimony of Taylor's mother that she had not noticed any of the items stolen from the boys that were hanging or lying about in plain view in her home. And Renee's husband—who used the same dresser himself—testified that he knew nothing about any bullets being in the house at all.

A dissenting opinion cites the testimony of Taylor's mother and girlfriend for the proposition that Taylor was at his mother's home the night of the murders playing cards "all evening." Those witnesses, the dissent says, also purportedly "confirmed" that Taylor's sister Renee was out of town that night and thus could not have had a conversation with Taylor about the murders. But Taylor's mother, sister, and girlfriend all had an obvious motive to script their testimony to protect him. And they just as obviously had ample opportunity to do the same—notwithstanding Anna Taylor's rather incredible assertion at trial that none of Taylor's family members had ever discussed the events of September 29 (the night of the murders) with each other before testifying about them at trial. By contrast, Beverly Shackleford, Eugene Taylor, and Jeffrey Brown had no opportunity to coordinate their testimony at all. And Renee Taylor's testimony that she was out of town the night of September 29 was nearly incoherent. She had told Homicide Detective Wohl on October 4 that she had left for Nashville on Sunday, September 30—just a few days before her interview with Wohl. But at trial—to the prosecutor's obvious surprise—she testified that, on September 29, she had been "in Cincinnati—Nashville. I was in Nashville, I think." She testified further that she had left Louisville on Wednesday, September 25, in the afternoon, after a birthday party for her daughter—even though she told Wohl on October 4 that she had left on September 30, around 9 p.m.—without any mention of a birthday party.

The dissenting opinion thus relies upon a string of contingencies, few of which were credible, and all of which the jury would have needed to accept to have acquitted Taylor. To wit: that Beverly Shackleford, Eugene Taylor, and Jeffrey Brown had all fabricated their testimony that Taylor admitted or boasted about killing the two boys—even though Shackleford had no motive and Brown had no ability to fabricate their respective accounts; that Taylor's mother, sister, and girlfriend had all testified truthfully, notwithstanding their motive and ability to fabricate a coordinated story to protect Taylor, and notwithstanding numerous aspects of their testimony that any sentient juror would find dubious; that it was merely a coincidence, in the days after the murders, that Taylor's girlfriend and brother-in-law—as opposed to someone else's—were wearing items of clothing stolen from the dead boys; that it was a coincidence as well that Nelson's cassettes and shoes were found on and under Taylor's bed; and that therefore perhaps Eugene (or Taylor's brothers Ray Ray or Mikee, or Anna Taylor's boyfriend John Cole), rather than Taylor, had murdered Nelson and Stephenson.

On this record, there was no "reasonable possibility"—not to mention "much more than a 'reasonable possibility[,]'" *Ayala*, 576 U.S. at 276—that a jury would embrace all those contingencies. And setting aside Wade's statement, the proof of Taylor's guilt was overwhelming. True, the jury asked to listen to Wade's recorded statement during its deliberations, which, in fairness, is the best point that the dissent can offer in support of its conclusion. But to cite that point as proof of a more-than-reasonable possibility that, absent Wade's statement—and notwithstanding the compelling evidence of Taylor's guilt—the jury would have decided this case differently, is at best pure speculation. And "*Brecht* requires more than speculation" for a habeas court to grant relief. *Id.* at 281. We have no lawful basis, more than 35 years after the victims' murders and Taylor's trial, to invalidate the State's criminal judgment in this case.

## C.

Finally, we reject Taylor's claim that his counsel was constitutionally ineffective for failing to develop a claim under the Supreme Court's decision in *Swain*. The *Swain* decision, as the Supreme Court explained in overruling it, was understood to impose "on defendants a crippling burden of proof[.]" *Batson*, 476 U.S. at 92. Specifically, to meet that burden, "a

defendant must show a pattern of racial discrimination in prior cases as well as in his own." *Ford v. Georgia*, 498 U.S. 411, 420 (1991). As explained above, Taylor could not make that showing as to even his own case. For that reason, among others, his trial counsel was not constitutionally ineffective, and Taylor was not prejudiced, by counsel's decision not to develop that claim further. *See generally Taylor*, 972 F.3d at 789.

\* \* \*

The district court's judgment is affirmed.

---

**DISSENT**

---

KAREN NELSON MOORE, Circuit Judge, dissenting.  Victor Dewayne Taylor has insisted for decades that his prosecutors unconstitutionally struck all but one of the Black prospective jurors in his capital trial.  Taylor is right—his prosecutor admitted to the trial court that these jurors were challenged because of their race.  The Kentucky Supreme Court wrote a one-sentence dismissal of Taylor's claim on direct appeal, *Taylor v. Commonwealth* (*Taylor I*), 821 S.W.2d 72, 74 (Ky. 1991), and revisited the claim more thoroughly in postconviction proceedings, *Taylor v. Commonwealth* (*Taylor II*), 63 S.W.3d 151, 156–57 (Ky. 2001).  Not one judge on this en banc court disputes that *Taylor II* impermissibly contradicted *Batson v. Kentucky*, 476 U.S. 79 (1986), in rejecting Taylor's claim.  Yet the majority insists that we must pretend that *Taylor II* never happened and instead read tea leaves in *Taylor I*'s one-sentence denial.  This topsy-turvy travesty violates the Supreme Court's interpretation of 28 U.S.C. § 2254(d), contravenes the Court's *Batson* caselaw, and undermines the Antiterrorism and Effective Death Penalty Act of 1996's (AEDPA's) bedrock principle of deference to state courts. The majority has not just sounded Taylor's death knell; it has also put the writ of habeas corpus into the ground.  I dissent.

Context is vital to understanding the gross injustice in Taylor's case.  In the mid-1980s, prosecutors from Jefferson County, Kentucky prosecuted three Black men—James Kirkland Batson, Randall Lamont Griffith, and Victor Dewayne Taylor—within years of each other.  At the time, the Kentucky Prosecutor's Handbook stated that prospective jurors who share the defendant's race were not "preferable," and it was policy and practice for Jefferson County prosecutors to strike all prospective jurors who were Black or shared a defendant's ethnic background.  *See* Taylor Postconviction Br. at 24–29.[1]  At Batson's, Griffith's, and Taylor's trials, the Jefferson County prosecutors struck most or all Black prospective jurors.  Batson was

---

[1]Taylor submitted this evidence to the *Taylor II* court.  *See* Taylor Postconviction Br. at 24–28.  Because the majority should have considered *Taylor II*—as Judge Griffin lays out—we may consider this evidence.  *See* J. Griffin Op. at 39–42, 50.

tried by an all-white jury; so was Griffith.  Just one Black person sat on Taylor's jury.  *See Batson*, 476 U.S. at 83; *Griffith v. Kentucky*, 479 U.S. 314, 317 (1987); Taylor Direct Appeal Br. at 47; Taylor Postconviction Br. at 21.

The Supreme Court addressed Batson's and Griffith's cases in back-to-back blockbuster decisions.  The Supreme Court granted Batson relief, setting forth a three-step test to review peremptory challenges allegedly used to exclude jurors on the basis of race.  *See Batson*, 476 U.S. at 96–97, 100.  Because Griffith's case was pending on direct appeal when *Batson* was issued, the Supreme Court concluded that Griffith was retroactively entitled to the rule espoused in Batson's case. *See Griffith*, 479 U.S. at 328.

Yet almost no habeas petitioner has emulated Batson's and Griffith's victories in court because of three nearly insurmountable legal hurdles.  First, *Batson* is toothless.  At step two of *Batson*'s test, prosecutors need supply only a facially valid race-neutral reason for challenging a juror, and very few "neutral" explanations are rejected as pretextual.  *See Purkett v. Elem*, 514 U.S. 765, 767–68 (1995) ("The second step of this process does not demand an explanation that is persuasive, or even plausible."); Michael J. Raphael & Edward J. Ungvarsky, *Excuses, Excuses:  Neutral Explanations Under* Batson v. Kentucky, 27 U. MICH. J.L. REFORM 229, 235–36 (1993); Jeffrey Bellin & Junichi P. Semitsu, *Widening Batson's Net to Ensnare More Than the Unapologetically Bigoted or Painfully Unimaginative Attorney*, 96 CORNELL L. REV. 1075, 1076–78 (2011).

Second, very few defendants may retroactively benefit from Supreme Court decisions in habeas cases.  Unless your case was pending on direct appeal when a Supreme Court decision was issued—as in *Griffith*—you're almost certainly out of luck.  *See* 28 U.S.C. § 2244(b)(2)(A); *Teague v. Lane*, 489 U.S. 288, 307–08, 311–12 (1989); *Edwards v. Vannoy*, — U.S. —, 141 S. Ct. 1547, 1557–61 (2021).

Third, Congress passed AEDPA twenty-five years ago because its members felt that the federal courts should owe the states more deference in habeas proceedings.  *See* 130 Cong. Rec. S1855–61 (daily ed. Feb. 6, 1984); 141 Cong. Rec. H4086–89 (daily ed. Feb. 8, 1995).  AEDPA provides that we may grant relief only if a state court's merits decision is contrary to or

unreasonably applies Supreme Court precedent or if the state court's decision was based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d). If a state court's decision "consist[s] of a one-word order, such as 'affirmed' or 'denied,'" for example, a federal habeas court "should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, — U.S. —, 138 S. Ct. 1188, 1192 (2018); *see also Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991) ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground."). And if there is "no lower [state] court opinion to look to," *Wilson*, 138 S. Ct. at 1195, the federal courts "must determine what arguments or theories supported or, as here, could have supported, the state court's decision," *Harrington v. Richter*, 562 U.S. 86, 102 (2011). That's how heavy AEDPA deference is: if the only state-court decision that addresses a habeas claim consists of just *one word*, we must retroactively conjure up reasoning to justify the state court's outcome—even if the state court was wrong.

Taylor is the rare habeas petitioner who has surmounted *Batson*'s steep substantive stockade, waded through the boggy moat of retroactivity caselaw, and traversed AEDPA's battlements of deference. First, Taylor has successfully asserted a *Batson* claim. His prosecutor failed to supply any race-neutral reason for striking Black persons off Taylor's jury. Indeed, the prosecutor's response to Taylor's objection was overtly racist: "[T]he Commonwealth would note defense also struck at least one or two black folk. . . . In accordance with case law, *the Commonwealth has no other rational reason—if I strike all* [i.e., "black folk"] it then becomes objectionable under the cases from, as I understand it, coming from California." 4/7/86 Hr'g Tr. at 10 (emphases added); *but see* J. Kethledge Op. at 14 ("[W]hat the prosecutor sought to convey here is anyone's guess."). Second, *Batson* was issued the same day that Taylor's trial concluded. *See Batson*, 476 U.S. at 79; Appellant's Br. at 5. Taylor, like Griffith, thus retroactively benefits from *Batson*'s test. Third, as the majority seemingly concedes, the Kentucky Supreme Court unreasonably misstated, misapplied, and contradicted *Batson* in "the last related state-court decision that does provide a relevant rationale," *Wilson*, 138 S. Ct. at 1192—*Taylor II*. *See* J. Griffin Op. at 42–47; *see also* J. Kethledge Op. at 9–10 ("[Taylor] contends[] [that] the [*Taylor II*] court's insistence upon 'a showing of "other relevant circumstances" that create an inference

that the prosecutor struck the jurors on the basis of their race[,]' implied that the court thought that a defendant can never establish a prima facie case based on numbers alone. One could read the opinion in *Taylor II* to have that implication; and we have no quarrel with Taylor's point that the implication would misconstrue *Batson*." (last alteration in original, citation omitted)).

Taylor has threaded his meritorious habeas claim through the eyes of three needles, and we are constitutionally compelled to vacate his conviction. Yet he has befallen an unprecedented and unfounded fourth needle that the majority has newly fabricated in Taylor's case: a look-away doctrine. Now, the majority requires that we replace what a state supreme court actually stated in "the last related state-court decision that does provide a relevant rationale," *Wilson*, 138 S. Ct. at 1192, with this federal court's post hoc speculations of what we think the state supreme court could have considered. The majority's novel approach violates the logic of *Wilson*, *Ylst*, and *Richter*; flouts the plain text of § 2254(d)(1); and railroads the entire point of AEDPA. The Kentucky Supreme Court said what it meant and meant what it said. We should take the state court's words at face value; we should not muzzle its justices to rely instead on our own conjectures.

I thus partially join Judge Griffin's and Judge Cole's dissents and fully join Judge White's dissent. I agree with Judge Griffin's thorough analysis of the Supreme Court's look-through doctrine and his conclusion that we must consider what the Kentucky Supreme Court stated about *Batson* in *Taylor II*. And, as Judge Griffin explains, the *Taylor II* court's articulation of the relevant three-part test impermissibly contradicted *Batson*. *See* J. Griffin Op. at 42–47. Even if we were to look at *Taylor I*, however, Taylor should still triumph because the *Taylor I* court unreasonably applied *Batson*. As Judge Cole thoughtfully explains, a prosecutor's "noting the race of potential jurors and using that information to disproportionately remove two-thirds of the potential Black jurors" sufficiently establishes a prima facie *Batson* violation. *See* J. Cole Op. at 29. Further, as Judge White meticulously dissects, the majority's flawed pattern-of-strikes analysis flouts *Batson* and its progeny. *See generally* J. White Op. I also believe that we must address Taylor's meritorious Confrontation Clause claim, even though Taylor did not raise the issue in his en banc petition. Thus, I must part ways with Judge Griffin and join Judge Cole on that issue. I join in full Judge Cole's rigorous analysis of the Confrontation Clause

question, and I would hold that Taylor merits habeas relief on that issue as well. To that end, I join all but footnote one in Judge Griffin's dissent. I also join all but § I.A.i. of Judge Cole's dissent because that section states that we must look at *Taylor I* alone. I fully join Judge White's dissent.

I end as I began, with context. The Supreme Court created our modern federal habeas jurisprudence in cases like *United States v. Shipp*, 203 U.S. 563 (1906), and *Moore v. Dempsey*, 261 U.S. 86 (1923), to combat postbellum anti-Black mob violence and the "legal lynching" of Black men by the Jim Crow justice system. Michael J. Klarman, *The Racial Origins of Modern Criminal Procedure*, 99 MICH. L. REV. 48, 50–53 (2000); *see also* MARK CURRIDEN & LEROY PHILLIPS, CONTEMPT OF COURT: THE TURN-OF-THE-CENTURY LYNCHING THAT LAUNCHED A HUNDRED YEARS OF FEDERALISM (2001). At issue in *Shipp* and *Moore* were Black defendants, like Taylor, whose prosecutors systematically struck Black persons off their juries. *Shipp*, 203 U.S. at 571; *Moore*, 261 U.S. at 89. Later cases like *Batson*, *Griffith*, and, more recently, *Flowers v. Mississippi*, — U.S. —, 139 S. Ct. 2228 (2019), remind us that the unconscionable and unconstitutional practice of systematically striking persons of color from juries persists to this very day. I reiterate that Taylor was prosecuted by the same persons at the same time and in the same unconstitutional manner as Batson and Griffith. To me, it is inconceivable that the majority denies Taylor the relief that the Supreme Court accorded to Batson and Griffith. With the weight of history on my shoulders, I cannot stand idly by while the majority bakes new law from scratch to justify Taylor's unconstitutional trial and execution.

By condemning Victor Dewayne Taylor to die, the majority confirms a largely unspoken truth: the once-great writ of habeas corpus now means nothing. *Cf. Ex parte Bollman*, 8 U.S. (4 Cranch) 75, 95–96 (1807) (Marshall, C.J.); *see* Hon. Diane P. Wood, *The Enduring Challenges for Habeas Corpus*, 95 NOTRE DAME L. REV. 1809, 1810 (2020) ("The rule of law is not well served when people are told that they have a remedy, but in fact they do not."). Only Congress or the Supreme Court can save the writ from its legal hollowness and revive "the symbol and guardian of individual liberty." *Peyton v. Rowe*, 391 U.S. 54, 58 (1968). Until that day comes, I refuse to help the majority entomb the writ of habeas corpus. I dissent.

———————————

**DISSENT**

———————————

COLE, Circuit Judge, dissenting. Victor Taylor's trial was marred by two paradigmatic constitutional violations. First, the prosecutor struck members of the jury venire on the basis of their race and admitted to doing so. Second, the trial court allowed the introduction of an accomplice statement without cross-examination in direct violation of the Confrontation Clause. The Kentucky Supreme Court had multiple opportunities to right the errors of Taylor's trial and failed to do so. Because our court fails to rectify these egregious constitutional violations, I respectfully dissent.

I.

A. BATSON

*i. Adjudication on the merits*

I agree with the majority's rejection of Taylor's invitation to "look-through" the decision in *Taylor I* to the later decision in *Taylor II*. Taylor's *Batson* claim was last adjudicated on the merits by the Kentucky Supreme Court in *Taylor I*. The fact that the Kentucky Supreme Court referenced Taylor's *Batson* claim at a later date in *Taylor II* does not render that later decision a merits adjudication. *See Greene v. Fisher*, 565 U.S. 34, 40 (2011) ("A later affirmance of [a] decision on alternative procedural grounds, for example, would not be a decision resulting from the merits adjudication.").

Nor can we employ *Wilson's* look-through provision to consider the court's reasoning in *Taylor II*. That's because federal courts conducting habeas review may consider only those materials that were in the state court record at the time it made its decision. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). The state court merits adjudication must be contrary to or an unreasonable application of federal law *at the time it was made*. *Id.* at 182. That precludes our consideration of factors that the state court could never have considered in rendering its decision: namely the subsequent thoughts of a different set of justices ten years later.

Our inquiry therefore is whether the *Taylor I* decision denying Taylor's *Batson* claim was an unreasonable application of clearly established federal law at the time it was made.

### ii. Unreasonable application

Where, as here, the state court summarily denies a claim of error, the habeas court must determine what arguments could have supported the state court decision. *Harrington v. Richter*, 562 U.S. 86, 102 (2011). In this case, that determination is simple. The *Batson* three-step test first requires that the defendant establish a prima facie case by raising an inference of discrimination. Next, the prosecutor has an opportunity to provide a race-neutral reason. Finally, the trial judge considers whether the race-neutral reason was pre-textual. *Batson v. Kentucky*, 476 U.S. 79, 96 (1986). Because the trial took place before *Batson*, the trial court did not hold a *Batson* hearing. Therefore, the prosecutor did not offer a race-neutral reason and the trial judge did not decide whether the reason was pretext. So the only reason the Kentucky Supreme Court could have rejected Taylor's *Batson* claim is a failure to raise an inference of discrimination.

No fair-minded jurist could conclude that Taylor failed to raise at least an inference of discrimination. *See Johnson v. California*, 545 U.S. 162, 168 (2005) (an inference is less than a "strong likelihood" or "preponderance"). The prosecutor in Taylor's trial noted the race of each potential juror on his juror chart. That fact alone suggests that the prosecutor considered race when selecting jurors. And his use of peremptory strikes confirms that suspicion. The prosecutor used 50% of his peremptory strikes to remove potential Black jurors, even though they made up little more than 15% of the venire. And while the prosecutor accepted only 33% of the qualified Black jurors, he accepted 87% of the qualified white jurors.

If noting the race of potential jurors and using that information to disproportionately remove two-thirds of the potential Black jurors is not enough to raise an inference of discrimination, then we can let the prosecutor speak for himself. When Taylor's counsel objected to the seating of the jury because the prosecutor had disproportionately struck Black jurors, the prosecutor explained that he had "no other rational reason" for his use of strikes. This colloquy took place before *Batson* was decided, at a time when striking jurors on the basis of

race had not yet been held unconstitutional. And so the prosecutor explained that, under his understanding of the case law, his actions were not objectionable unless he struck *all* the Black jurors.

The majority opinion does not even attempt to propose an alternative interpretation of the prosecutor's statement that he had "no other rational reasons" for striking the Black members of the venire. Indeed, it is impossible to see what the prosecutor could have meant if we do not take his statement as an admission to striking jurors on the basis of race.

The heart of *Batson*'s holding is that a prosecutor cannot strike jurors on account of their race. Here, the prosecutor admitted to doing just that. A determination that the prosecutor's actions did not violate *Batson* can be nothing other than a patently unreasonable application of *Batson* itself.

## B. CONFRONTATION CLAUSE

### *i. Contrary to federal law*

*Taylor I*'s Confrontation Clause analysis was contrary to clearly established federal law the moment it was decided. That much is uncontroversial. At the time of the Kentucky Supreme Court's ruling in 1990, *Ohio v. Roberts* governed Confrontation Clause challenges. In *Roberts*, the Supreme Court held that a hearsay statement is admissible against a criminal defendant in two circumstances: if it 1) falls within a "firmly rooted hearsay exception," or 2) possesses "particularized guarantees of trustworthiness." *Ohio v. Roberts*, 448 U.S. 56, 65–66 (1980). Statements bearing "particularized guarantees of trustworthiness" must be "at least as reliable as evidence admitted under a firmly rooted hearsay exception." *Idaho v. Wright*, 497 U.S. 805, 821 (1990).

In *Taylor I,* the Kentucky Supreme Court found that Wade's statement fell within "a recognized exception to the hearsay rule" for statements against penal interest. *Taylor I*, 821 S.W.2d at 76. But, at the time, it was clearly established that an accomplice's custodial confession does not fall within a "firmly rooted" hearsay exception. This court has held that the principle was clearly established by *Douglas* (1965), *Bruton* (1968), and *Lee* (1986). *Hill v.*

*Hofbauer*, 337 F.3d 706, 717 (6th Cir. 2003) ("We hold that *Douglas*, *Bruton*, and *Lee* evidence that the Supreme Court had clearly established the principle that a co-defendant's custodial confessions are unreliable and not within a 'firmly rooted' hearsay exception"); *see also Fulcher v. Motley*, 444 F.3d 791, 800 (6th Cir. 2006).

With regard to *Roberts*'s second category, it was clearly established at the time of Taylor's direct appeal that courts could not consider corroborating evidence in assessing the reliability of a hearsay statement. *Wright*, 497 U.S. at 822 (rejecting the "contention that evidence corroborating the truth of a hearsay statement [could] properly support a finding that the statement bears 'particularized guarantees of trustworthiness'"). "To be admissible under the Confrontation Clause, hearsay evidence used to convict a defendant [had to] possess indicia of reliability by virtue of its inherent trustworthiness, not by reference to other evidence at trial." *Id.* And *Lee* held that there is a "weighty presumption" against the admission of unexamined accomplice statements, which requires substantial indicia of reliability to overcome. *Lee*, 476 U.S. at 546 ("[O]n the record before us, there is no occasion to depart from the time-honored teaching that a codefendant's confession inculpating the accused is inherently unreliable, and that convictions supported by such evidence violate the constitutional right of confrontation.").

In fact, the flaws of the Kentucky Supreme Court's Confrontation Clause analysis are so evident that both our circuit and the Supreme Court have recognized them. First we held that "*Taylor*'s four-factor test, and the Kentucky Supreme Court's application of it, were contrary to the reasoning and the result that federal law required in at least two ways." *Fulcher*, 444 F.3d at 805. Next, the Supreme Court, in *Crawford* itself, cited *Taylor* as a case in which the trial court "admit[ted] core testimonial statements that the Confrontation Clause plainly meant to exclude." *Crawford v. Washington*, 541 U.S. 36, 64 (2004). It is clear that admitting Wade's statement violated the Confrontation Clause. The Kentucky Supreme Court's opposing decision is contrary to federal law.

### ii. Harmless error

Habeas petitioners must have suffered "actual prejudice" from a constitutional error. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). That standard is met when a federal court "is

in grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict." *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995). "[G]rave doubt [ ] mean[s] that, in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." *Id.* at 435. "In other words, a tie goes to the petitioner." *Miller v. Genovese*, 994 F.3d 734, 744 (6th Cir. 2021).

An accomplice statement incriminating the defendant is "devastating to the defendant." *Bruton v. United States*, 391 U.S. 123, 136 (1968). It is so devastating, in fact, that the prejudicial effect is akin to the defendant's own confession. *Id.* This is a well-known feature of our system. Accomplice statements that cannot be cross-examined are so prejudicial to defendants that we give co-defendants separate trials. *Id.* Even jury instructions cannot cure the severe prejudice caused by such statements. *Id.* In *Gray v. Maryland*, for instance, the Court redacted the defendant's name from his codefendant's confession and even then, the prejudice to the defendant was too strong. 523 U.S. 185, 188 (1998). And the Court has acknowledged that an accomplice's confession might be harmful even when the defendant's own confession is properly introduced. *Cruz v. New York*, 481 U.S. 186, 192 (1987). In this context, it strains credulity that the admission of Wade's statement could have been harmless. The facts of Taylor's trial bear this out.

Wade's statement was particularly prejudicial in the context of Taylor's trial. Wade said that Taylor shot the victims even after he had pleaded with Taylor not to. Wade then said that Taylor came back from the shooting "laughin' like, you know, he was crazy or somethin'." Importantly, Wade's statement was the only evidence that identified Taylor as the shooter. And the prosecutor relied heavily on Wade's statement as evidence that tied the whole case together and solved the credibility problems with other prosecution witnesses.

Jeffrey Brown was a jailhouse lawyer who testified that Taylor admitted to the shootings while they were in Jefferson County Jail together. He said that Taylor sought his legal advice and admitted that he shot the boys after Wade had said Taylor's name in front of one of the boys. Brown explained that inmates came to him for advice because he had beaten two murder charges himself.

Not only did the jury hear that Brown had proudly evaded two murder charges, it also heard that he received a substantial sentence benefit for his testimony and did not come forward with his statement until about six months after his alleged conversation with Taylor. The sentence benefit reduced first degree robbery to second degree robbery and dropped the persistent felony charge. Rather than a 20-to-life sentence, Brown received five years to run concurrently with time he was already serving for other charges.

Most damning to Brown's credibility is the fact that, before trial, he recanted his statement on two separate occasions. The majority dismisses this fact, noting simply that Brown "briefly recanted" his testimony. In reality, Brown told three different people that his allegations against Taylor were untrue. First he told Wade's attorneys that he had lied to the police when he gave his statement about Taylor in order to get out of the twenty-to-life sentence he was facing for robbery. Next, Brown wrote a letter to Taylor's prosecutor saying that his statement against Taylor was untrue. He even threatened to come forward with the truth, stating that if called to testify, "I will say everything that is true to help these young men. I will tell the truth that you made a deal with me to get them." But that never happened. Brown got exactly what he asked for: He testified at Taylor's trial and served no additional time for the robbery.

Eugene Taylor, Taylor's cousin, testified that he saw Taylor and Wade in a car with the boys on the night of the murder. Later that night, he said that he saw Taylor at Taylor's mother's house with a Trinity High gym bag, some tennis shoes, blue jeans, a Led Zeppelin cassette tape, a watch, a ring, and some firecrackers. Eugene testified that he heard Taylor ask his sister whether she had heard anything about the murder of two white boys and heard Taylor confess that he had shot them. Then Eugene testified that Taylor swapped cash and pistols with his sister and split the cash with Wade.

But Taylor's sister, Renee, testified that she was out of town that night and never had that conversation with Taylor. Taylor's girlfriend confirmed that Renee was out of town that night. And Taylor's girlfriend testified that she was with Taylor at his mother's house all evening until 11 pm on the night of the murders and Eugene was not there. Taylor's mother confirmed that Taylor was with his girlfriend at her house all evening.

Eugene made his statement to the police weeks after the murder on the day he was arrested and charged with robbery, rape, sodomy, terroristic threatening, and assault. After he made the statement, the charges were dismissed. In the lead-up to Taylor's trial, Eugene was again arrested, this time for receiving stolen property, burglary, and possession of marijuana. The burglary and the marijuana charges were dismissed and the receiving stolen property charge was amended to a misdemeanor. One of the conditions of his probation was that he pay restitution of $1000 to a church at $100 per month. Eugene never made any payments, but his probation was never revoked. At the time of Victor Taylor's trial, Eugene had been additionally charged with burglary and arson. Eugene's lawyer was present when he testified against Taylor, and he asked to consult his attorney in the middle of his testimony. The jury watched as Eugene's testimony was put on pause to allow him to consult with his attorney.

Beverly Shackelford testified at trial that Taylor admitted on three separate occasions that he shot the victims. The first statement was allegedly made on October 1st, the second on October 3rd at approximately 6 pm and the third on October 4th also around 6 pm. Beverly was interviewed by a detective in the case on October 3rd at 6:57 p.m., less than an hour after she testified that the second statement was made, but she did not tell the police about the supposed statement in her interview. And at the time she alleges the third statement was made, Taylor was already in police custody. Taylor was arrested at about 4:20 a.m. on October 4th and could not have confessed to Beverly at 6 p.m. It seems patently incredible to believe her trial testimony when, mere hours before Taylor was arrested, Beverly gave a statement to the police containing none of the information in her trial testimony. All Beverly told the police was that her mother told her that her brother and a friend saw "Victor Spencer" and a friend leave the bar shortly after the two murder victims. She said nothing about talking to Taylor, nothing about any confessions, nothing about a green school jacket. She didn't even get his name right.

The two eyewitnesses, Pepper and Pace, both had credibility problems as well. Pepper and Pace were at a restaurant and witnessed the kidnapping at gunpoint. They both identified Taylor as the kidnapper at trial, but neither could identify Taylor in a photo lineup they were shown before his arrest. And their testimony about what they thought the kidnapper looked like differed. For example, one said he had a mustache, and the other was completely confident that

he was clean-shaven. What's more, Pace gave the police a fake name when he first spoke to them because he was wanted on another charge. While Taylor was awaiting trial, Pace had a felony assault charge amended by the prosecution to a misdemeanor and had the sentence probated. He was on probation when he testified at trial.

The Commonwealth also introduced physical evidence. Four Winchester-Western .357 magnum rounds were found in the dresser of Taylor's sister's house. These were of the same caliber and brand as those used to kill the victims. But only three of the four bullets were semi-jacketed like the ones used to shoot the victim. And a Commonwealth expert ran an elemental composition test on the makeup on the lead in the bullets. While the two bullets used to kill both victims came from the same batch of lead, the bullets in the sister's dresser "differed significantly" from the two that killed the victims. The expert testified that the three .357 bullets were not manufactured in the same lot as those used to kill the victims. Renee Taylor testified that she put the bullets in her dresser because she found them and a few other miscellaneous bullets when she moved into the house and wanted to move them out of the attic where the children played.

A witness to the abduction said that Taylor was wearing a beige shirt, and a beige shirt was found near the crime scene. An expert testified that the shirt had hairs consistent with Taylor's head and pubic hair. But the expert also explained that hair testing is not a conclusive form of positive identification and at best can only eliminate a particular suspect. The expert ultimately did not conclude that the hairs originated from Taylor, but only that he could not be ruled out as a suspect. Some of the factors that were "consistent" with Taylor's hair were factors that are present in all or almost all Black hair types.

In Taylor's mother's house, the police found cassette tapes with the initials of one of the boys and firecrackers that matched firecrackers found in the boy's car, as well as the shoes, radio, and car ornament of one of the victims. Taylor's brother-in-law was found wearing jeans that had belonged to one of the victims and Taylor's brother-in-law testified that he had found the jeans in the dirty clothes pile and assumed they were Taylor's. Taylor's girlfriend also had a jacket that belonged to one of the boys and testified that Taylor had recently given her that jacket. During an autopsy, the coroner found sperm in the anus of one of the victims. But there

were not sufficient cells to obtain a conclusive test. And the coroner found no evidence of rectal, anal, or genital trauma in either of the victims.

It is also important to consider how Wade's statement affected all of the prosecution evidence. During his closing argument, the prosecutor argued that the state witnesses should be believed because Wade's statement proved their testimony was accurate, even though each had their credibility seriously impeached by Taylor's attorneys. Most importantly, the jury relied on Wade's statement. During their deliberations the jury asked for and was allowed to hear the tape-recorded statement again. A jury's request to rehear evidence is a strong indication that the introduction of that evidence was not harmless. *See Fulcher*, 444 F.3d at 811. After all, the most likely reason a jury would ask to rehear evidence is if it found the other evidence insufficient. *Id.*

Wade's statement was the linchpin of the prosecution's case. It allowed the jury to draw inferences and connect all of the evidence to Taylor. Without it, the evidence is substantially weaker. For example, the possessions found in Taylor's mother's house are strong evidence connecting Taylor to the crime once the jury hears his accomplice say that Taylor was the killer. But without that statement, the belongings could have been stashed there by any number of people. Eugene Taylor testified that when Victor Taylor got to his mother's house, Anna Taylor, John Cole (Anna Taylor's boyfriend), Victor's two sisters (Renee Woods and Anna), Victor's two brothers, Ray Ray and Mikey Taylor, and Victor's girlfriend (Sherry) were there.

Remember also that Pepper and Pace were able to identify Wade in a lineup but were unable to identify Taylor when given a photo lineup. If we narrow the list to only men to conform with Pepper and Pace seeing Wade and another man kidnapping the victims, that still leaves Ray Ray, Mikey, John, and Eugene as people who could have stashed the belongings in Anna's house, along with anyone else who had access between the night of the murders and the police search.

Indeed, without Wade's statement, it might have been a viable defense theory that Eugene committed the murders with Wade. Apart from Wade's statement, Eugene's testimony may be the most direct evidence connecting Taylor to the crime. But multiple witnesses say that

they didn't see Eugene at the party that night.  Eugene and Taylor are cousins, so they may have similar hair or may look similar to eyewitnesses.  Eugene had access to Taylor's mother and sister's houses.  And he was arrested around the same time for another, very similar crime involving assault, rape, and sodomy.  In fact, Wade eventually recanted his testimony against Taylor and swore that Eugene had committed the murders with him, not Taylor.  Of course, this defense theory evaporates when Wade's statement is admitted at Taylor's trial.

It is hard to imagine what might have happened in a trial without Wade's confession.  But in some ways, that is precisely the point.  Wade's statement colored so many aspects of the trial.  I come away from the record with "grave doubts" about whether the unconstitutional admission of Wade's testimony had "substantial and injurious" effect on the jury's verdict.

## II.

Twenty years ago, when the Kentucky Supreme Court reviewed Taylor's constitutional claims, Justice Keller made a prediction in his dissent that should ring true to this day.  "The egregious and palpable nature of this constitutional violation virtually guarantees that a future reviewing court will grant Taylor a new trial. . . . *When* a future court grants Taylor a new trial, today's majority opinion's 'legacy' will be only further evidentiary staleness."  *Taylor II*, 63 S.W.3d at 170.  Twenty years later, this court still refuses to recognize the egregious and palpable nature of the constitutional violations in Victor Taylor's trial.

I respectfully dissent.

—————————————

**DISSENT**

—————————————

GRIFFIN, Circuit Judge, dissenting.

This case is *Batson v. Kentucky* revisited.

In the mid-1980s, a jury in Jefferson County, Kentucky, convicted an African American man of multiple criminal charges. During jury selection, the prosecutor unconstitutionally used his peremptory challenges to strike four African Americans from the venire. The defendant's attorney unsuccessfully objected to the race-based nature of the strikes. These are the facts of *Batson v. Kentucky*, 476 U.S. 79, 82–83 (1986); they are also the facts of this case. But while the Supreme Court promptly reversed James Batson's conviction, petitioner Victor Taylor has spent the last thirty-five years on death row.

The Kentucky Supreme Court had the opportunity to provide Taylor with the remedy *Batson* requires. But instead of doing so, it misapplied *Batson* by reading an additional requirement into the burden for establishing a prima facie case of race discrimination and then concluding that Taylor failed to satisfy it. This was "contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

The majority opinion does not dispute that the Kentucky Supreme Court misconstrued *Batson*. It just turns a blind eye to that error. Instead of taking the state court at its word for how it handled Taylor's *Batson* claim, the majority opinion conjures reasons for how it *could* have upheld Taylor's death sentence. In doing so, the majority substitutes its own judgment for the state court's judgment—the very harm that the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") is meant to avoid. *See, e.g.*, *Nicolas v. Attorney Gen. of Md.*, 820 F.3d 124, 131 (4th Cir. 2016).

I would not ignore the Kentucky Supreme Court's mistake. Because the state court misapplied *Batson*, Taylor's claim should receive de novo review. In my view, Taylor established a prima facie case of purposeful race discrimination in the selection of his jury. And

because the prosecutor failed "to come forward with a neutral explanation for challenging black jurors," *Batson* mandates that we grant habeas relief. 476 U.S. at 97, 100. I would reverse the district court's denial of Taylor's § 2254 petition and therefore respectfully dissent.[1]

I.

I begin with an antecedent question: Which decision of the Kentucky Supreme Court are we reviewing? The majority focuses on the 1991 decision affirming Taylor's convictions on direct appeal, *Taylor v. Commonwealth* (*Taylor I*), 821 S.W.2d 72 (Ky. 1991). Taylor raised his *Batson* claim then, but the court did not address it with particularity. Instead, it merely stated that "Taylor, through counsel, raises forty-four assignments of alleged error in this appeal. We have carefully reviewed all of the issues presented by Taylor. . . . Allegations of error which we consider to be without merit will not be addressed here." *Id.* at 74. I agree with my colleagues that this decision constitutes a merits adjudication of Taylor's *Batson* claim for purposes of AEDPA. *See Harrington v. Richter*, 562 U.S. 86, 99–100 (2011).

The problem with the majority's analysis, however, is that the Kentucky Supreme Court explicitly addressed the merits of Taylor's *Batson* claim in a later opinion in this case: *Taylor v. Commonwealth (Taylor II)*, 63 S.W.3d 151 (Ky. 2001). *Taylor II* reviewed a denial of a motion for postconviction relief pursuant to Kentucky Rule of Criminal Procedure 11.42. In that proceeding, Taylor asserted a claim under *Swain v. Alabama*, 380 U.S. 202 (1965), which was the Supreme Court's applicable standard for challenging juror strikes on the basis of race at the time of his trial.[2] *Taylor II*, 63 S.W.3d at 156. Because Taylor raised a *Batson* claim in his direct appeal (*Taylor I*), the Kentucky Supreme Court affirmed the denial of his Rule 11.42 motion regarding his new *Swain* claim, concluding that it was simply "an attempt to get around [the] long-established rule" that a Rule 11.42 motion may not be utilized to "permit a convicted

---

[1]Taylor's en banc petition and supplemental briefing discussed only his *Batson* claim, and therefore I decline to address the merits of his other arguments in this dissent.

[2]In *Batson*, the Supreme Court overruled *Swain*. *See Batson*, 476 U.S. at 100 (White, J., concurring). Although *Swain* was in effect at the time of Taylor's trial, because *Batson* was issued before Taylor's direct appeal was decided, *Batson* applies to Taylor's case. *Griffith v. Kentucky*, 479 U.S. 314, 328 (1987); *see also id.* at 316–17, 327 (discussing Griffith's 1984 trial in Jefferson County, Kentucky, where "[t]he prosecution used four of its five allotted challenges to strike four of the five prospective black jurors").

defendant to retry issues which . . . were raised in the trial court and upon an appeal considered by this court." *Id.* at 157 (citation omitted).

The Kentucky Supreme Court could have stopped there. But it did not. Instead, the court addressed the merits of both the *Swain* and *Batson* claims raised by Taylor:

> The evidence presented by Taylor at the evidentiary hearing focused on the first part of his burden under *Swain, i.e.*, whether the prosecutor's office had a systematic and intentional practice of excluding blacks from juries in criminal trials. But he presented no evidence that this practice "continued unabated" at his trial. In addition to a prosecutor's exclusion of minority members from the venire via peremptory strikes, *Batson* also requires—to establish a prima facie case—a showing of "other relevant circumstances" that create an inference that the prosecutor struck the jurors on the basis of their race. In the case at bar, there was no showing of other relevant circumstances at the time defense counsel objected to the seating of the jury and no such argument on this point was made on direct appeal. Moreover, the trial court specifically noted that there was no evidence that African-Americans were systematically excluded from the venire. Therefore, since a prima facie case was not made under *Batson*, it certainly was not made under the much more restrictive holding of *Swain*.

*Id.* (citations omitted). The majority opinion refers to this passage as dicta. But "where a decision rests on two or more grounds, none can be relegated to the category of obiter dictum." *Woods v. Interstate Realty Co.*, 337 U.S. 535, 537 (1949). It is clear that the Kentucky Supreme Court's *Batson* analysis is "sufficient to support [its] judgment," that the court "intended to rest the judgment (if necessary) on its conclusion about the issue," and that the court "considered the issue and consciously reached a conclusion about it." *See Wright v. Spaulding*, 939 F.3d 695, 701–03 (6th Cir. 2019). Under our precedent then, this *Batson* analysis is an alternative holding, not dicta. *See id.*; *Freed v. Thomas*, 976 F.3d 729, 738 (6th Cir. 2020) ("Of course, . . . alternative holdings are not dicta.").

The majority opinion does not consider *Taylor II*, even though it specifically addressed and explained the "reason [Taylor's] *Batson* claim failed *on direct appeal*." 63 S.W.3d at 156 (emphasis added). This distinguishes the Kentucky Supreme Court's discussion of the *Batson* claim in *Taylor II* from the sort of alternative holdings that are insulated from federal court review by the adequate and independent state ground doctrine. *See Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989). The Commonwealth agreed with this characterization of *Taylor II* during

this appeal, writing in its panel brief that "[i]n the process of denying the [*Swain*] claim, the Court also reiterated that the original *Batson* claim was denied on direct appeal because no *prima facie* case had been shown (as would have been the case in a more onerous *Swain* claim)." So too did one of the dissenting Justices in *Taylor II*. *Id.* at 171–72 (Stumbo, J., dissenting). Accordingly, *Taylor II*'s unambiguous language clarifies the scope of our review here. We must review the Kentucky Supreme Court's merits adjudication of Taylor's *Batson* claim in *Taylor I* and, as a part of that adjudication, its explanation in *Taylor II* specifying why it rejected the claim.

I acknowledge that this procedure is unusual, but we often engage in similar exercises. For example, consider our practice when a state court of last resort denies a petitioner's federal claim on the merits without explanation with a simple "affirmed" or "denied." *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). On habeas review, we do not immediately proceed to "determin[ing] what arguments or theories . . . could have supported[ ] the state court's decision." *Richter*, 562 U.S. at 102. Instead, a federal court should "'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale"—often, a decision by the state intermediate appellate court. *Wilson*, 138 S. Ct. at 1192. "It should then presume that the unexplained decision adopted the same reasoning."[3] *Id.*

As discussed above, *Taylor I* rejected Taylor's *Batson* claim without explanation. In Kentucky, death penalty appeals are filed directly with the state supreme court, *see* Ky. R. Civ. P. 74.02(2), so we do not have an intermediate appellate court's decision to look to. Instead, we have a subsequent opinion from the *same court* in the *same case* articulating why it rejected Taylor's *Batson* claim. In my view, this explanation must be considered and not ignored. Kentucky's highest court issued both opinions and its latter opinion contains the "relevant rationale" for its earlier, unexplained decision rejecting Taylor's *Batson* claim. *Wilson*, 138 S. Ct. at 1192.

---

[3]Outside of the habeas context, consider too a district court's denial of a motion for reconsideration. Oftentimes, the court will deny the motion and "affirm[ ] and elaborate[ ] upon its [original] order." *Rosen v. Goetz*, 129 F. App'x 167, 169 (6th Cir. 2005) (per curiam). On appeal, the court of appeals may consider the district court's discussions of the merits in both orders, even though the court denied the motion for reconsideration. *Id.*; *see United States v. Amaya*, 750 F.3d 721, 725 (8th Cir. 2014); *United States v. Milo*, 506 F.3d 71, 73 (1st Cir. 2007).

In sum, we need only take the Kentucky Supreme Court at its word. We should not "presume" anything or speculate regarding what rationale "could" have supported its decision. *Id.* Because *Taylor II* is the "last related . . . decision" of the Kentucky Supreme Court in this case and provides us with its rationale for rejecting Taylor's *Batson* claim, we must review it for AEDPA purposes. *Id.* Thus, the majority's reliance on *Richter*'s "could have supported" approach is misplaced. *See* 562 U.S. at 102.

## II.

I now address whether the Kentucky Supreme Court's decisions in this case are "contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). I would hold that they are.

## A.

Taylor argues that the Kentucky Supreme Court applied the wrong standard in determining whether he made an adequate prima facie showing of discrimination under *Batson*. To establish a prima facie case, a defendant need only "raise an inference that the prosecutor . . . exclude[d] the veniremen from the petit jury on account of their race." *Batson*, 476 U.S. at 96. This requires three showings. First, a defendant "must show that he is a member of a cognizable racial group." *Id.* Second, he must show "that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race." *Id.* "Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race." *Id.* Here, all agree that Taylor is African American and that he challenged the prosecutor's removal of four African Americans from the venire.

"The 'Constitution forbids striking even a single prospective juror for a discriminatory purpose.'" *Foster v. Chatman*, 136 S. Ct. 1737, 1747 (2016) (quoting *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008)). But as a practical matter, it is unlikely that a defendant will establish a prima facie case if the only evidence he presents is the prosecutor's strike of a single

venireman of the same race.**4** *See Paulino v. Castro*, 371 F.3d 1083, 1091–92 (9th Cir. 2004). A defendant typically must show something more. "For example, a 'pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination." *Batson*, 476 U.S. at 97. This has been a common method of satisfying the prima facie burden in the years since *Batson* issued. *See, e.g.*, *Davis v. Ayala*, 576 U.S. 257, 260–61 (2015) (Ayala "made a prima facie *Batson* showing" where the prosecutor "used seven peremptories to strike all of the African-Americans and Hispanics who were available for service"); *see also Foster*, 136 S. Ct. at 1747 (parties agreed Foster established a prima facie case where prosecutor struck all four African American jurors who qualified to serve); *Miller-El v. Cockrell*, 537 U.S. 322, 326, 338 (2003) (parties agreed Miller-El established a prima facie case where prosecutors had "used peremptory strikes to exclude 10 of the 11 African-Americans eligible to serve on the jury"). "Similarly, the prosecutor's questions and statements during voir dire examination and in exercising his challenges may support or refute an inference of discriminatory purpose." *Batson*, 476 U.S. at 97. In *Batson*, the Supreme Court emphasized that "[i]n deciding whether the defendant has made the requisite showing, the trial court should consider all relevant circumstances." *Id.* at 96.

In *Taylor II*, the Kentucky Supreme Court correctly recited the first two elements of the prima facie burden under *Batson*, but then stated that "*Batson* also requires—to establish a prima facie case—a showing of 'other relevant circumstances' that create an inference that the prosecutor struck the jurors on the basis of their race." 63 S.W.3d at 157. Applying that rule, the court held that because "there was no showing of other relevant circumstances at the time defense counsel objected to the seating of the jury and no such argument on this point was made on direct appeal," Taylor's claim failed. *Id.*

Here the Kentucky Supreme Court misstated the law. *Batson* does not categorically require that a defendant show "other relevant circumstances" beyond the defendant's race and the prosecution's striking of prospective jurors of the same race. First, the plain language of the

---

**4**In recent years, "the [Supreme] Court has extended *Batson* in certain ways." *Flowers v. Mississippi*, 139 S. Ct. 2228, 2243 (2019) ("A defendant of any race may raise a *Batson* claim, and a defendant may raise a *Batson* claim even if the defendant and the excluded juror are of different races."). But for our purposes here, we need only focus on the holding of *Batson* itself.

Supreme Court's recitation of the standard makes this clear:  a petitioner must show that "these facts [that is, the first two elements] *and* any other relevant circumstances" establishes a prima facie case of discrimination.  *Batson*, 476 U.S. at 96 (emphasis added).  Second, immediately after laying out the standard, the Court elaborated: "In deciding whether the defendant has made the requisite showing, the trial court should consider *all* relevant circumstances," thus highlighting the holistic nature of the analysis.  *Id.* (emphasis added).  Third, the Court gave an example of a situation in which "other relevant circumstances" would *not* be required to satisfy the prima facie burden: "a 'pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination."[5]  *Id.* at 96–97 (emphasis added).  After all, a "pattern" of strikes may simply mean that the prosecutor struck multiple African American prospective jurors—more instances of the second element being satisfied.  *See* Pattern, *Merriam-Webster Online Dictionary*, https://www.merriam-webster.com/dictionary/pattern (last visited July 22, 2021), ("a reliable sample of traits, acts, tendencies, or other observable characteristics of a person, group, or institution").  In some instances, a pattern of strikes will be sufficient to satisfy the third element, and in others, it will not.  *Compare Ayala*, 576 U.S. at 260–61 (Ayala "made a prima facie *Batson* showing" where prosecutor "used seven peremptories to strike all of the African-Americans and Hispanics who were available for service"), *with United States v. Bishop*, 914 F.2d 249, 1990 WL 130475, at *3 (4th Cir. 1990) (per curiam) (table) (defendants "failed to establish the third element of the *Batson* test because they asserted nothing more than that [one] stricken juror was black").

In light of the Supreme Court's clear language, I cannot accept a reading of *Batson* that treats the failure to prove "other relevant circumstances" as a per se failure to establish a prima facie case.  By segmenting the third prima facie element into two necessary showings, the Kentucky Supreme Court improperly heightened the standard under *Batson*.

---

[5]The Supreme Court reiterated this point in a later case, which issued before Taylor's direct appeal was decided: "In *Batson*, we held that determining whether a prima facie case has been established requires consideration of all relevant circumstances, including whether there has been a pattern of strikes against members of a particular race." *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 631 (1991) (citing *Batson*, 476 U.S., at 96–97).

B.

Not every error by a state court satisfies AEDPA's highly deferential standard, of course. "Federal habeas relief may not be granted for claims subject to § 2254(d) unless it is shown that the earlier state court's decision 'was contrary to' federal law then clearly established in the holdings of th[e Supreme] Court; or that it 'involved an unreasonable application of' such law; or that it 'was based on an unreasonable determination of the facts' in light of the record before the state court."[6] *Richter*, 562 U.S. at 100 (citations omitted). At issue here is the "contrary to" clause, which (the Supreme Court has made clear) has an "independent meaning" from the "unreasonable application" clause. *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

*Williams* explained the meaning of this provision. *Id.* at 405–06 (O'Connor, J., delivering the opinion for the Court on the meaning of the "contrary to" clause). "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.'" *Id.* at 405. Thus, "[a] state-court decision will certainly be contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [its] cases."[7] *Id.* Consider the following example from *Williams*:

> If a state court were to reject a prisoner's claim of ineffective assistance of counsel on the grounds that the prisoner had not established by a preponderance of the evidence that the result of his criminal proceeding would have been different, that decision would be "diametrically different," "opposite in character or nature," and "mutually opposed" to [the Supreme Court's] clearly established precedent because [it] held in *Strickland* that the prisoner need only demonstrate a "reasonable probability that . . . the result of the proceeding would have been different."

---

[6]"A legal principle is 'clearly established' within the meaning of this provision only when it is embodied in a holding." *Thaler v. Haynes*, 559 U.S. 43, 47 (2010). Here, no one disputes that the burden for establishing a prima facie case of race discrimination in the jury selection process was "clearly established" in *Batson*'s holding before the Kentucky Supreme Court decided Taylor's direct appeal.

[7]"[A] state-court decision is also contrary to [Supreme Court] precedent if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at" an opposite conclusion. *Williams*, 529 U.S. at 405.

*Id.* at 405–06 (citation omitted). In this scenario, "a federal court will be unconstrained by § 2254(d)(1) because the state-court decision falls within that provision's 'contrary to' clause." *Id.* at 406.

Indeed, in *Williams* itself, the Court held that the Virginia Supreme Court's decision rejecting a claim of ineffective assistance of counsel was "contrary to" Supreme Court precedent because the court applied the heightened standard found in *Lockhart v. Fretwell*, 506 U.S. 364 (1993), on top of the rule in *Strickland v. Washington*, 466 U.S. 668 (1984), when it should have applied only the latter. 529 U.S. at 397; *see also Goodman v. Bertrand*, 467 F.3d 1022, 1028 (7th Cir. 2006) ("In conflating *Lockhart*'s heightened prejudice standard with *Strickland*'s prejudice analysis, the state court decision is 'contrary to' clearly established federal law."). The Supreme Court has thus made clear that § 2254(d)(1)'s "contrary to" clause is satisfied where a state court "sets forth the wrong legal framework," *Goodman*, 467 F.3d at 1028 (citation omitted), in a way that heightens the petitioner's burden beyond what the law requires. *See also Tennard v. Dretke*, 542 U.S. 274, 284 (2004) (rejecting a heightened relevance standard applied by the Fifth Circuit that "has no foundation in the decisions of this Court").

That is exactly what happened here. The Kentucky Supreme Court misread the third element of a prima facie case under *Batson* in a way that made Taylor's burden more difficult to satisfy. Recall the court's statement that "there was no showing of other relevant circumstances at the time defense counsel objected to the seating of the jury and no such argument on this point was made on direct appeal." *Taylor II*, 63 S.W.3d at 157. If a pattern of strikes qualifies as an "other relevant circumstance[ ]," then this statement is objectively false. During jury selection, Taylor's counsel argued that the prosecutor had engaged in a pattern of striking African American prospective jurors. Defense counsel (Mr. Jewell) and the prosecutor (Mr. Jasmin) had the following back-and-forth discussion during that objection:

| [MR. JEWELL:] | It is noted that the Commonwealth used, I believe, half of their strikes to exclude two-thirds of the minority members left on the panel. We would object to the seating of this jury. |
| --- | --- |
| MR. JASMIN: | You say I used two-thirds of my strikes to strike minorities? |

| | |
|---|---|
| MR. JEWELL: | Half of your strikes to exclude two-thirds of minority members on the panel. |
| MR. JASMIN: | Half, meaning four and a half? |
| MR. JEWELL: | You used four--You used eight, I believe, correct? |
| MR. JASMIN: | That's correct. |
| MR. JEWELL: | Okay. And four of them were directed at minority members. |
| MR. JASMIN: | And, for the record, the Commonwealth would note defense also struck at least one or two black folk. |
| MR. JEWELL: | The defense struck one minority member. |
| MR. JASMIN: | In accordance with case law, the Commonwealth has no other rational reason—if I strike all it then becomes objectionable under the cases from, as I understand it, coming from California. |

Taylor also raised his pattern-of-strikes argument on direct appeal, emphasizing three things of note here: (1) "[t]he prosecutor directed 4 of his peremptory strikes toward black members of the jury panel"; (2) the prosecutor "struck 2/3 of the minority members of the prospective jury panel (i.e. 4 persons)"; and (3) the prosecutor "never offered any explanation for the exercise of those peremptory challenges." Thus, when the Kentucky Supreme Court stated that Taylor had not provided any "other relevant circumstances" at the time the jury was seated or on direct appeal, it could not have thought a pattern of strikes qualifies as such.

Because *Taylor II* misread *Batson* by heightening the standard for establishing a prima facie case, I would hold that it is "contrary to" clearly established Supreme Court precedent. § 2254(d)(1).

## III.

"[U]nconstrained by § 2254(d)(1) because the state-court decision falls within that provision's 'contrary to' clause," *Williams*, 529 U.S. at 406, I review Taylor's *Batson* claim "without the deference AEDPA otherwise requires," *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007). Relief depends on Taylor demonstrating that he remains "in custody in violation of the Constitution . . . of the United States." § 2254(a); *see also Magana v. Hofbauer*, 263 F.3d 542,

551 (6th Cir. 2001). Having done so, I conclude Taylor has demonstrated a clear *Batson* violation and is entitled to conditional habeas relief.

## A.

"[A] defendant satisfies the requirements of *Batson*'s first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." *Johnson v. California*, 545 U.S. 162, 170 (2005). "[T]he Supreme Court has not provided a more particularized view of what constitutes a prima facie showing of discrimination under *Batson*." *Carmichael v. Chappius*, 848 F.3d 536, 545 (2d Cir. 2017) (citation and internal quotation marks omitted). But it has provided some examples. *See Johnson*, 545 U.S. at 170 (use of three peremptory challenges (out of twelve) to remove all three African American prospective jurors); *Miller-El*, 537 U.S. at 342 (exclusion of 91% of the eligible African American prospective jurors).

Recall here that thirty-eight qualified prospective jurors remained when the trial court authorized counsel to exercise peremptory strikes. Six of those thirty-eight were African American, comprising 16%. The prosecutor used half of his peremptory strikes to remove four of those six African American jurors—a 67% exclusion rate. The numbers here do not rise to the same level condemned by the Supreme Court in *Johnson* and *Miller-El*, but they do not clearly fail to "raise an inference" of discrimination, either.

In this regard, *United States v. Alvarado* is instructive. 923 F.2d 253 (2d Cir. 1991). There the Second Circuit held that a defendant successfully establishes a prima facie case under *Batson* when he shows a significant statistical disparity between the prosecution's minority exclusion rate and the overall minority composition of the venire. *Id.* at 255. "[An exclusion] rate nearly twice the likely minority percentage of the venire strongly supports a prima facie case under *Batson*." *Id.* at 256. The court found a prima facie case had been established where the prosecution excluded half of the prospective African American and Hispanic jurors. *Id.* The statistical disparity here exceeds that in *Alvarado*. If the prosecutor had in fact exercised his peremptory strikes on a race-neutral basis, one would expect the exclusion rate to roughly match the rate of qualified African American jurors. But the exclusion rate exceeded the rate of

African American jurors by a factor of *four*: the prosecutor struck 67% of African American jurors who comprised only 16% of the remaining venire.

The disparity here is more than enough to raise an eyebrow; it would "permit the trial judge to draw an inference that discrimination has occurred." *Johnson*, 545 U.S. at 170. This conclusion is consistent with our decision in *Drain v. Woods*, 595 F. App'x 558, 571 (6th Cir. 2014). There, this court found that the petitioner had established a prima facie case of discrimination under *Batson* where "the prosecutor exercised 78 percent of her peremptory challenges to exclude minorities, despite the fact that minorities composed only 28 percent of the venire at its inception, and 31 percent at its conclusion." *Id*. (citation and internal quotation marks omitted). In sum, Taylor made a prima facie showing under *Batson*.

B.

At this point, the *Batson* analysis would typically proceed to steps two and three. But the prosecutor offered no race-neutral reason for his strikes. *Batson* makes clear that if "the facts establish, prima facie, purposeful discrimination and the prosecutor does not come forward with a neutral explanation for his action, our precedents require that [the] petitioner's conviction be reversed." 476 U.S. at 100. Thus, Taylor's *Batson* claim should be resolved in his favor at step two.

When a trial court fails to carry out the *Batson* process, courts sometimes remand to the district court to hold an evidentiary hearing to determine the prosecutor's state of mind during jury selection. *See, e.g.*, *United States v. McMath*, 559 F.3d 657, 665–66 (7th Cir. 2009); *Love v. Scribner*, 278 F. App'x 714, 718 (9th Cir. 2008) (mem. op.). However, a remand here would be a futile exercise. For one thing, more than thirty-five years have passed since Taylor's trial. *See Snyder*, 552 U.S. at 486 (remand would be futile after eleven years had passed since the trial). For another, Taylor's prosecutor has passed away, as has the trial judge.

In *Batson*, the Supreme Court remanded the case for further proceedings "[b]ecause the trial court flatly rejected the objection without requiring the prosecutor to give an explanation for his action." 476 U.S. at 100. Here, however, the trial court allowed the prosecutor to respond to Taylor's objection to his use of peremptory strikes on the alleged ground of race. In response,

the Jefferson County assistant prosecutor stated: "In accordance with case law, the Commonwealth has no other rational reason--if I strike all [of the "black folk"] it *then* becomes objectionable under the cases coming from, as I understand it, coming from California." (Emphasis added.) While the majority opinion asserts that the meaning of this statement is "anyone's guess," I view it as an admission that the prosecutor exercised his peremptory challenges based on race. *See* Section II.B., *supra* (for the statement presented in context).

Furthermore, other powerful evidence Taylor presented at the postconviction hearing in state court bolsters this reasonable conclusion: (1) passages from the Kentucky Prosecutor's Handbook, stating that jurors from a minority group with a possible grudge against law enforcement or sharing a racial or national background with the defendant were not "preferable" for the prosecution; (2) a Kentucky trial judge's observation that she discharged a jury panel in a particular case because the Commonwealth's Attorney used peremptory strikes to remove all African American jurors on the venire and because of her knowledge that the Commonwealth had utilized its strikes similarly in other cases; (3) a former Jefferson County public defender's testimony that he observed the Commonwealth's pattern and practice of using peremptory strikes to remove African Americans from jury venires; (4) a private attorney's testimony that he had observed the same pattern and practice by the Commonwealth in many murder cases; and (5) a former Assistant Commonwealth Attorney's testimony about that office's understanding that prosecutors should strive to strike jurors with the same ethnic background as the defendant and that the same Commonwealth's Attorney who prosecuted Taylor believed that having African Americans on a jury panel was not desirable.

Ultimately, the prosecutor's "no other rational reason" statement certainly does not articulate a race-neutral reason for striking African American jurors. Thus, the Commonwealth failed to satisfy its "extremely light burden" at step two. *United States v. Harris*, 192 F.3d 580, 586 (6th Cir. 1999).

A "trial judge's failure to adhere to the constitutional framework" of *Batson* may "complicate[ ]" appellate review, but it typically does not preclude resolution of the case. *Rice v. White*, 660 F.3d 242, 258 (6th Cir. 2011). *Rice* provides a roadmap for what to do where, as here, the trial court neither acknowledges the *Batson* standard nor attempts to apply the three-

step analysis: we may nevertheless examine the trial record and "the context of the proceedings" ourselves. *Id.* at 258–59. In that case we concluded that the trial court had, in its own unorthodox way, rejected "the prosecutor's race-neutral reasons" and "f[ound] at step three that the prosecutor engaged in invidious discrimination." *Id.*

Like in *Rice*, the trial court here did not follow the *Batson* framework (nor could it have been expected to at the time), but the record compels a similar conclusion. The prosecutor was allowed to offer a race-neutral reason for his peremptory strikes. He took the opportunity to respond but failed to satisfy his burden at step two. While the record here does not show the normal course of a *Batson* challenge, it tracks a specific situation the Supreme Court described in *Batson*: a prima facie case coupled with a prosecutor's failure to "come forward with a neutral explanation for his action" requires reversal.[8] 476 U.S. at 100.

The Commonwealth invites us to consider other reasons why the prosecutor *might* have stricken the African American jurors. That would be improper, as the Supreme Court has made clear that post-hoc arguments are impermissible under *Batson*. *Miller-El v. Dretke*, 545 U.S. 231, 252 (2005) ("A *Batson* challenge does not call for a mere exercise in thinking up any rational basis."). Scouring a cold record for reasons that might explain the prosecutor's strikes nullifies a prosecutor's duty to offer race-neutral rationales at step two (and would improperly insert our judgment for that of the trial court's at step three). *Id.*; *see also Johnson*, 545 U.S. at 172 ("The inherent uncertainty present in inquiries of discriminatory purpose counsels against engaging in needless and imperfect speculation when a direct answer can be obtained by asking a simple question."). So, while the prosecutor had submitted his juror chart to the trial court at the time Taylor lodged his objection, that is not enough.[9] A "prosecutor must give a clear and reasonably specific explanation of his legitimate reasons for exercising the challenge[ ]."

---

[8]It makes no difference that the trial court eventually checked a box in the Notice of Death Sentence Review indicating that African Americans were not systematically excluded from the jury, as the majority opinion highlights. At step two of *Batson*, the burden is on the prosecutor, not the trial court.

[9]Moreover, the prosecutor's juror chart listed the race of each potential juror. This hardly furthers the Commonwealth's argument that the strikes were race neutral. *See Foster*, 136 S. Ct. at 1744 (on prosecutor's juror chart, "the names of the black prospective jurors were highlighted in bright green," "[a] legend in the upper right corner of the lists indicated that the green highlighting 'represents Blacks,'" and "[t]he letter "B" also appeared next to each black prospective juror's name." (citation omitted)).

*Batson*, 476 U.S. at 98 n.20 (citation and internal quotation marks omitted).  This the prosecutor did not do.

Finally, although the facts of the crimes as found by the jury are atrocious, we do not evaluate whether the *Batson* violation was harmless.  *Batson* "involves a structural error, which is not subject to harmless error analysis."  *United States v. McFerron*, 163 F.3d 952, 956 (6th Cir. 1998) (internal quotation marks omitted).

IV.

Victor Taylor was prosecuted in Jefferson County, Kentucky, by the same prosecutor's office as James Batson.  Both African American defendants alleged that their prosecutor unconstitutionally struck jurors because of their race.  The Supreme Court's decision in Batson's case provides a strict procedure to combat individual and institutional invidious racial discrimination in the selection of juries.  That process was not followed in Taylor's case. Because this case presents the identical constitutional violation that occurred in *Batson*, I would reverse the denial of Taylor's § 2254 petition and grant conditional habeas relief.  I therefore respectfully dissent.

———————————

**DISSENT**

———————————

HELENE N. WHITE, Circuit Judge, dissenting.  I concur in Judge Griffin's, Judge Cole's and Judge Moore's thoughtful dissents in all respects except footnote 1 of Judge Griffin's dissent and Part I.A.i. of Judge Cole's dissent.[1]  I write separately to respond to a particularly troubling aspect of the majority opinion's reasoning.

**I.**

The majority opinion contends that the prosecutor's objection to Taylor's attempt to strike for cause three African-American members of the venire constitutes "an immovable obstacle to Taylor's *Batson* claim because a fairminded jurist would likely conclude that 'a prosecutor who aimed to purge the jury of African-Americans would not object to the *defense's* attempt to remove three of them from the venire.'"  This analysis incorrectly implies that a *Batson* violation can only be shown where there is evidence that the prosecutor intended to categorically exclude *every* black member of the jury, an impossible hurdle in this case—where the prosecutor explicitly asserted that he did not believe doing so would be permissible—and one that *Batson* plainly does not require.  The *Batson* Court was unequivocal in its holding that "the Constitution prohibits all forms of purposeful racial discrimination in selection of jurors." *Batson v. Kentucky,* 476 U.S. 79, 88 (1986).  Thus, the exclusion of even one juror on the basis of race constitutes a constitutional violation.  *Flowers v. Mississippi*, 139 S.Ct. 2228, 2242 (2019) ("[E]ven a single instance of race discrimination against a prospective juror is impermissible"); *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008) ("[T]he Constitution forbids

———————————

[1] I agree with the majority and Judge Cole that *Taylor I* is the decision to which we apply AEDPA review. *Taylor I* gives no reasoning for the rejection of Taylor's *Batson* claim.  Normally in such a case we follow the rule from *Harrington v. Richter*, requiring us to "determine what arguments or theories . . . could have supporte[d] the state court's decision" and then consider whether "it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of" the Supreme Court.  *Cullen v. Pinholster*, 563 U.S. 170, 187–88 (2011) (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011)) (alterations in original).  The question here is whether when there is a later decision of the state's highest court explaining the earlier summary denial, AEDPA precludes us from looking at that later decision when it does not conflict with, but rather explains, the earlier decision.  I agree with Judge Griffin and Judge Moore that this is not prohibited under the circumstances presented here.

striking even a single prospective juror for a discriminatory purpose") (quoting *United States v. Vasquez-Lopez*, 22 F.3d 900, 902 (9th Cir. 1994)); *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 142 n.13 (1994) ("Because the right to nondiscriminatory jury selection procedures belongs to the potential jurors, as well as to the litigants, the possibility that members of [the cognizable group] will get on the jury despite the intentional discrimination is beside the point. The exclusion of even one juror for impermissible reasons harms that juror and undermines public confidence in the fairness of the system."). In attempting to articulate a theory which could have supported the state court's decision, the majority endorses an interpretation of *Batson* that itself is "manifestly contrary to clearly established federal law." *Drain v. Woods*, 595 F. App'x 558, 570 (holding that "[t]he Michigan appellate court's analysis" finding that the fact that "the prosecutor did not try to remove all blacks from the jury is strong evidence against a showing of discrimination," is "manifestly contrary to clearly established federal law").

Beyond being contrary to *Batson*, the majority's analysis ignores the practical realities of this case and of jury selection more generally. A hypothetical is illustrative here. Imagine that a prosecutor approaches voir dire guided by two primary goals, in order of importance: (1) to include as many jurors as possible who strongly favor the death penalty; and (2) to exclude as many black jurors as possible. In keeping with these goals, the prosecutor opposes the defendant's attempts to exclude black jurors expressing particularly favorable views of the death penalty while simultaneously seeking to exclude all other black jurors. The prosecutor's conduct would unquestionably be a *Batson* violation because jurors would be excluded solely on account of their race.

Here, although we do not have definitive insight into the prosecutor's strategy, his choices during voir dire are nearly indistinguishable from the hypothetical. After objecting to Taylor's attempt to strike for cause three black jurors who expressed particularly favorable views of capital punishment, the prosecutor exercised his peremptory strikes to exclude all but two black jurors:[10] Eleanor Fisher, one of the jurors whom Taylor had attempted to strike for cause and Joyce Booker, who, during voir dire, indicated that any defendant convicted of an

---

[10]Notably, despite their pro-death penalty views, the prosecutor utilized his peremptory strikes to exclude two of the three black jurors whom Taylor had sought to exclude for cause.

aggravated murder should receive the death penalty. The defense then exercised one of its fourteen peremptory strikes to exclude Booker, leaving Fisher, a woman whom the defendant believed was unfairly biased against him, as the only individual of his race on the jury.

What's more, the prosecutor knew, and affirmatively acknowledged that he risked reversal if he excluded every black juror on the venire. *See Flowers*, 139 S. Ct. at 2246 (explaining that a prosecutor's acceptance of a black juror during jury selection may be attributable to an "attempt 'to obscure the otherwise consistent opposition to' seating black jurors" (quoting *Miller-El v. Dretke*, 545 U.S. 231, 250 (2005))). This case was tried as the Supreme Court was deliberating in *Batson*, a case involving the same prosecutor's office as involved here and in which the primary disagreement between the parties was the adoption of the rule articulated by the California Supreme Court in *People v. Wheeler* that where a party "presumes that certain jurors are biased merely because they are members of an identifiable group distinguished on racial . . . grounds" and "peremptorily strikes all such persons for that reason alone," it is a violation of the defendant's right to an impartial jury. 22 Cal.3d 258, 276 (1978). The prosecutor here specifically acknowledged that striking all black jurors would be objectionable under the "cases . . . coming from California," a clear reference to *Wheeler* and its progeny, and thus revealed his belief that a conviction would be in jeopardy of reversal, depending on the outcome in *Batson*, if he were to "purge the jury of African-Americans." So it seems clear that the prosecutor never intended to eliminate *every* black juror from the venire. And to the extent that the prosecution was motivated to exclude most, but not all black jurors, what better strategy than to object to the for-cause exclusion of black jurors whose answers in voir dire suggested a bias against the defendant, and subsequently exercise peremptory strikes to eliminate every black juror who did not express those views? The prosecutor did so, and it worked; the empaneled jury had one black member, whom the defendant had specifically sought to exclude for bias.

The majority opinion ignores the fact that a prosecutor, like any litigant, may have competing motives when conducting jury selection. But this does not undermine legitimate claims of racial bias in jury selection. This is particularly true in capital cases, like Taylor's, where jury selection strategy is often focused, in large part, on potential jurors' views of capital

punishment. That a prosecutor favors inclusion of specific black jurors on account of their views on the death penalty is of limited relevance in rebutting the presumption that the use of peremptory strikes to exclude other black jurors was discriminatory.

We need not determine with certainty why the prosecutor exercised his strikes as he did to conclude that Taylor satisfied his prima facie case, but the context here is important. The majority ignores that context and misapplies the clear holding of *Batson* to find that Taylor is not entitled to habeas relief.

## II.

I also note that it is irrelevant to a proper *Batson* challenge that Taylor struck one of the two remaining black jurors. Here, six of the thirty-eight qualified individuals on the venire were black. The prosecution exercised eight peremptory strikes, four of which were used to exclude black jurors. This reduced the percentage of black jurors on the venire from 15.8% to a mere 6.6%. Taylor struck one black juror and thirteen white jurors, excluding jurors at a rate nearly identical to that of the remaining jury pool (Taylor utilized approximately 7% of his strikes to eliminate black jurors who, after the prosecutor's exclusions, made up just under 7% of the pool). And because Taylor exercised his strikes in a race-neutral way, nearly identically reflecting the statistical makeup of the jury, Taylor's use of strikes did nothing to change the proportional makeup of the jury. After the prosecution exercised its strikes, black jurors made up 6.6% of the jury and following the defense's additional peremptory strikes black jurors made up 6.25% of the jury.

It should go without saying that in determining whether a prosecutor's pattern of strikes gives rise to an inference of discrimination, the only relevant consideration is the prosecutor's use of strikes; the defendant's use of strikes is irrelevant. Even if a defendant's strikes were to offset a prosecutor's disproportionate exclusion of black jurors, that does nothing to change the presumption of discrimination arising from a prosecutor's discriminatory pattern of strikes. Here, the prosecutor and the defendant together struck seventeen white jurors from the panel. It is true that if the prosecutor had exercised twenty-one peremptory strikes to eliminate four black jurors plus all seventeen of those white jurors from the panel, there could be no inference of

discrimination.  But that is not what occurred here.  When viewed objectively, the fact that the prosecutor's use of strikes would only be proportional if he excluded more than three times the number of white jurors he actually did is itself damning evidence of discrimination.

Further, a defendant should not be expected to utilize his limited peremptory strikes to rebalance a jury that has been racially manipulated by the prosecutor.  Where the prosecutor excludes jurors based on race, the defendant's constitutional rights are violated, and it is the role of the courts, not defense counsel to remedy that violation.  "[T]he *Batson* Court did not accept the argument that race-based peremptories are permissible because both the prosecution and defense could employ them in any individual case and in essence balance things out."  *Flowers v. Mississippi*, 139 S. Ct. 2228, 2242 (2019).

For the foregoing reasons, I dissent.